MILWAUKEE VALVE COMPANY, INC., a Wisconsin corpora-
tion, Plaintiff-Respondent,

v.

MISHAWAKA BRASS MANUFACTURING, INC., a foreign
corporation, Defendant-Appellant.

Court of Appeals

No. 81–872. Submitted on briefs January 13, 1982.—
Decided March 2, 1982.
(Also reported in 319 N.W.2d 885.)

For the defendant-appellant the cause was submitted on the brief of *Constantine, Christensen, Krohn & Kerscher, S.C.,* of Racine.

For the plaintiff-respondent the cause was submitted on the brief of *Charles P. Graupner* of *Michael, Best & Friedrich* of Milwaukee.

Before Decker, C.J., Moser, P.J., and Randa, J.

DECKER, C.J. This appeal arises from two contracts for the sale of copper ingot. The seller claims the first contract was breached by the buyer's wrongful rejection of goods. As to the second contract, the seller claims that the buyer failed to effect proper cover, and that the trial court improperly excluded both parol evidence and purported fair market value testimony. We disagree and affirm.

The first contract was for the sale by Mishawaka Brass Manufacturing, Inc. (Mishawaka), of 200,000 pounds of "85-5-5-5" copper ingot to Milwaukee Valve Company, Inc. (Milwaukee Valve). The contract provided that the ingot had to comply with standards of the American Society for Testing of Materials (ASTM B-62 Standards). Milwaukee Valve rejected two shipments of this ingot and half of a third for noncompliace with ASTM B-62, and cancelled the contract.

The second contract was for the sale by Mishawaka of 110,000 pounds of "Navy M" copper ingot to Milwaukee Valve. Mishawaka sold the ingot to another customer when Milwaukee Valve would not take immediate delivery, and Milwaukee Valve bought Navy M ingot from another supplier when Mishawaka was unable to deliver at a later date.

Milwaukee Valve sued Mishawaka for the difference between the price of the Navy M ingot bought from another supplier and the price specified in its contract with Mishawaka. Mishawaka denied liability, and by

counterclaim sued Milwaukee Valve for breach of the first contract, claiming wrongful rejection of the 85–5–5–5 ingot.

The jury determined that the 85–5–5–5 ingot which Milwaukee Valve rejected failed to conform to the requirements of the first contract, that Mishawaka breached its contract to supply Milwaukee Valve with Navy M ingot, and that Milwaukee Valve in good faith and without unreasonable delay made a reasonable purchase of goods in substitution for those due from Mishawaka. Damages were calculated based upon the difference between the price of Navy M ingot bought in substitution and the price specified in Milwaukee Valve's contract with Mishawaka.

Mishawaka raises the following arguments:

(1) The 85–5–5–5 ingot rejected by Milwaukee Valve conformed to the contract specifications;

(2) Milwaukee Valve's purchase of Navy M ingot in substitution for that due from Mishawaka did not constitute cover as defined in sec. 402.712, Stats;

(3) The trial court erred in excluding testimony of Mishawaka's president as to market price of Navy M ingot at the time of breach of the contract; and

(4) The trial court improperly excluded prior oral negotiations concerning the shipping dates of Navy M ingot.

## REJECTION OF 85–5–5–5 INGOT

Section 402.106 (2), Stats., provides: "Goods or conduct including any part of a performance are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract." Section 402.601 gives a buyer the right to reject if goods fail to conform to the contract. Milwaukee Valve seasonably rejected two shipments of 85–5–5–5 ingot and half of a

third after it determined that the rejected ingot failed to conform to the contract.

The contract for 85–5–5–5 ingot required it to conform to ASTM B–62 standards. Mishawaka tested samples from each lot by wet chemical analysis before shipment and determined that the ingot conformed to the standards specified in the contract. Milwaukee Valve used spectrometer testing to determine that the ingot failed to conform to the contract.

Mishawaka claims that the jury determination that the 85–5–5–5 ingot rejected by Milwaukee Valve failed to conform to the contract is clearly erroneous and not supported by any credible evidence in the record because it was undisputed at trial that:

(1) ASTM standards require use of wet chemical analysis to resolve disputes; and

(2) wet chemical analysis is more accurate than spectrometer testing.[1]

Our review of the record indicates that there is sufficient credible evidence to support the jury's determination. The accuracy of Mishawaka's wet chemical analysis was thrown into doubt at trial. Although Mishawaka's analysis showed the first load to be conforming, a second wet chemical analysis by Mishawaka of samples from this load produced considerably different results. The variation greatly exceeded the margin of error for wet chemical analysis which Mishawaka's expert initially posited in support of the accuracy of this testing procedure.

Mishawaka and Milwaukee Valve agreed to have an independent laboratory test samples from the first shipment, and after that laboratory's wet chemical analysis corroborated Milwaukee Valve's spectrometer testing re-

---

[1] Mishawaka does not challenge the manner of rejection employed by Milwaukee Valve. *See* sec. 402.602, Stats. Instead, it challenges Milwaukee Valve's right to reject in the first instance.

sults, Mishawaka accepted return of the shipment. Return of the second shipment upon rejection was accepted without a request for independent laboratory analysis. The record also reflects that Mishawaka's president agreed that the ingot was nonconforming and commented that Mishawaka's wet chemical analysis equipment obviously was not being used properly.

The jury determination that the rejected 85–5–5–5 ingot was nonconforming is supported by credible evidence.

## PAROL EVIDENCE

The contract for purchase of the Navy M ingot was evidenced by a Milwaukee Valve purchase order dated October 10, 1978, which stated that delivery was to be "as required during the first quarter of 1979." It also stated that it was confirming a telephone conversation between the president of Milwaukee Valve and the president of Mishawaka. The president of Mishawaka, as Mishawaka's authorized agent, indicated acceptance by signing the order form in the space designated "accepted by."

At trial the president of Mishawaka adamantly asserted that during the telephone conversation referred to in the purchase order the parties either expressly agreed to normal delivery terms[2] or that normal delivery terms were presumed by both parties. The trial court excluded introduction of any evidence to that effect because it was an attempted variation of the terms of the contract by parol evidence. We agree.

---

[2] The president of Mishawaka stated that normal delivery terms in the ingot industry were for delivery 30 to 60 days after the date of the contract. This is the delivery schedule which had been followed with the earlier contract for 85–5–5–5 ingot.

Section 402.202, Stats., provides:

Final written expression: parol or extrinsic evidence. Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(1) By course of dealing or usage of trade (s. 401.-205) or by course of performance (s. 402.208);

(2) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The record indicates that the rejected evidence was offered solely to contradict the delivery terms specified in the purchase order accepted by Mishawaka's president. The evidence can in no way be construed as explanatory or supplemental, and goes to the accuracy of the contract, not its finality.

## COVER

The evidence indicates that Mishawaka sought to deliver Navy M ingot to Milwaukee Valve in November and December of 1978, but that Milwaukee Valve chose to rely on the delivery terms of the contract, "delivery as required during the first quarter of 1979." When Milwaukee Valve requested delivery during the first quarter of 1979, Mishawaka had sold the Navy M ingot promised to Milwaukee Valve, and indicated that it would be unable to supply Navy M ingot until after the first quarter of 1979.

Although Milwaukee Valve contracted for the purchase of 110,000 pounds of Navy M ingot (the same amount

promised by Mishawaka) on April 30, 1979, Mishawaka contends that as a matter of law the purchase cannot constitute cover.

Section 402.712, Stats., provides in part:

(1) After a breach . . . the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in s. 402.715, but less expenses saved in consequence of the seller's breach.

Mishawaka argues that the undisputed evidence establishes that the purchase was not made in substitution for its breach and reflected unreasonable delay because:

(1) Milwaukee Valve did not receive shipment of the order until several months after Mishawaka's breach; and

(2) the need created by Mishawaka's breach was filled by other orders placed before Mishawaka's breach.

Comment 2 of the Official U.C.C. Comments to sec. 2–712 (identical to sec. 402.712, Stats.) provides:

The definition of "cover" under subsection (1) envisages . . . contracts on credit or delivery terms differing from the contract in breach, but again reasonable under the circumstances. The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective.

As a matter of law we cannot say that the method of cover used by Milwaukee Valve was so ineffective that it was not in substitution for the ingot due from Mishawaka and constituted unreasonable delay.

To fill the ingot supply gap caused by Mishawaka's breach, Milwaukee Valve had to divert incoming shipments of Navy. M ingot from other suppliers to fill the orders for which the Mishawaka ingot had been purchased. The 110,000-pound order was then used to replace the inventory depletion created by this reallocation of orders. The exigency created by Mishawaka's breach continued until this 110,000-pound replacement order was received by Milwaukee Valve. We cannot conclude that Milwaukee Valve's quick action and shuffling of orders precludes as a matter of law a finding of cover.

Similarly, we cannot find as a matter of law that the price of the replacement Navy M ingot made the purchase unreasonable. Milwaukee Valve chose a longtime, reliable supplier that could guarantee shipment, although not for several months. *See generally* R. Summers & J. White, *Handbook of the Law Under the Uniform Commercial Code* sec. 6–3, at 218 (2nd ed. 1980) :

If the cover remedy is to work to the benefit of an aggrieved buyer, the court should give him wide latitude to reject the least expensive cover when there is any reasonable basis for choosing a more expensive cover (for instance, the goods are of better quality or the seller more reliable).

The jury was presented the above evidence, and was charged with determining whether Milwaukee Valve made, in good faith and without unreasonable delay, a reasonable purchase of goods in substitution for those due from Mishawaka. Its determination in favor of Milwaukee Valve is supported by sufficient credible evidence in the record.

Mishawaka also alleges error because expenses saved in consequence of the seller's breach were not determined

by the trial court or the jury. In Wisconsin, a seller whose performance is excused by the buyer's breach must prove savings accrued by noncompletion of the contract before it has met the burden of establishing its loss. *Hanz Trucking v. Harris Brothers Co.*, 29 Wis. 2d 254, 268–69, 138 N.W.2d 238, 246 (1965); *Schubert v. Midwest Broadcasting Co.*, 1 Wis. 2d 497, 502–03, 85 N.W.2d 449, 452 (1957). Because "[t]he fundamental idea in allowing damages for breach of contract is to put the plaintiff in as good a position financially as he would have been in but for the breach," *Schubert, supra,* 1 Wis. 2d at 502, 85 N.W.2d at 452; *see Hanz Trucking, supra,* 29 Wis. 2d at 268, 138 N.W.2d at 246, this burden of proof is doubtless equally applicable to a buyer whose performance is excused by the seller's breach, as in the case before us.[3]

We have carefully reviewed the record, and conclude that Milwaukee Valve produced sufficient evidence to prove that no expenses were saved by Mishawaka's breach. When a buyer covers, by definition the goods bought in substitution are used to meet an essential need, and therefore the buyer is not relieved from performing and does not save any performance expenses by the seller's breach. Expenses saved, if any, in cases of cover will more likely occur when the shipping terms of the cover contract differ from those in the original contract. *See* R. Summers & J. White, *supra,* sec. 6–3, at 217. In this case the shipping terms result in no savings to Milwaukee Valve. At trial Milwaukee Valve produced the cover contract and the contract with Mishawaka. Both require shipping to be "F.O.B. Del'd." Section 402.319 (1) (b), Stats., provides that when a shipping

---

[3] By the express terms of sec. 402.712 (2), Stats., when a buyer covers and seeks as damages the difference between the cost of cover and the contract price, the award must be decreased by expenses saved in consequence of the seller's breach.

term is F.O.B. the place of destination, as opposed to the place of shipment, the seller must bear the shipping expense.

We conclude that reasonable persons could not differ that the term "F.O.B. Del'd" contemplates that the goods will be delivered by the seller at its expense to the shipping address. In this case, because both Mishawaka and the cover vendor agreed to pay shipping expenses, Milwaukee Valve saved no expenses by covering.

## EXCLUSION OF MARKET VALUE TESTIMONY

Mishawaka argues that the trial court erred when it determined that Mishawaka's president was not competent to testify as to the market value of Navy M ingot. Although we conclude that the trial court did not err, we note that the testimony could have had no effect on the outcome of this case. The jury determined that cover occurred, and damages were properly calculated using the difference between the price of cover paid by Milwaukee Valve and the price specified in the breached contract. Sec. 402.712(2), Stats. Market value at the time of breach is arguably relevant only to a determination of whether the price of cover meets the good faith and reasonableness requirement of sec. 402.712(1). The jury heard evidence that Milwaukee Valve had received price quotes shortly after cover that were lower than the price it paid for cover. Even if Mishawaka's president had been able to estimate fair market value, the testimony would have been cumulative and of marginal value. Nonetheless, the fundamental failure of the excluded testimony is its fallacious basis.

Mishawaka's president testified that fair market value of Navy M ingot consisted of the sum of the cost of its ingredients, the cost of production, and profit, defined

as "as much profit as they [manufacturers] think they can get from a customer." He further testified that no resort could be had to prices published in trade journals because fair market value was nothing other than the price that could be obtained on the date in question. Such a contention is expressly contrary to sec. 908.03(17), Stats.

At best, this testimony indicates that there is no such thing as a market value standard, evidence of which the jury could consider in its determination of good faith and reasonableness of the cover purchase. More importantly, however, this witness's testimony demonstrates that he was utterly incapable of using his formula to derive a market value at the time of cover by Milwaukee Valve. Mishawaka's last sale of Navy M ingot (that which was promised but never delivered to Milwaukee Valve) was in January, three months before the act of cover. This ingot had not been manufactured by Mishawaka, but had been purchased ready-made from another manufacturer the previous September. It is reasonable to infer that Mishawaka did not have personal knowledge of the cost of ingredients and production of this load of Navy M ingot. Mishawaka made no other sales of Navy M ingot during the first quarter of 1979, nor did it produce any during this time period. It is undisputed that Mishawaka made no negotiations or sales of Navy M ingot on or about the date of cover. Therefore, even if Mishawaka could compute the cost of ingredients and production on that date, it had no transactions establishing "how much profit it could get" from a customer on that date.

We conclude that Mishawaka's president, by reason of his experience, had sufficient expertise to qualify as an expert for the purpose of expressing an opinion of the reasonableness of the price of cover. Nonetheless, we

find no error in the trial court's exclusion of his testimony as to market value. As we have noted, the proposed testimony was inherently fallacious and of no probative value as an opinion of market value. Exclusion of such evidence does not adversely affect the substantial right of Mishawaka, and thus, error may not be predicated upon such an exclusion. Sec. 901.03(1), Stats.

We have also noted that the questions of good faith and reasonableness of a purchase of cover are not exclusively determinable by evidence of market value or fair market value. "The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." Official U.C.C. Comment 2 to sec. 2–712, 40A Wis. Stats. Ann. sec. 402.-712, at 489 (1964).

*By the Court.*—Judgment affirmed.