**DONER et al., Appellants,**

**v.**

**SNAPP et al., Appellees.**

[Cite as *Doner v. Snapp* (1994); 98 Ohio App.3d 597.]

Court of Appeals of Ohio,
Miami County.

No. 94–CA–29.

Decided Nov. 18, 1994.

*William B. Balyeat,* for appellants.

*Dungan & LeFevre* and *John E. Hemm,* for appellees.

BROGAN, Judge.

Appellants, John D. and Elaine Doner, appeal from the trial court's grant of summary judgment in their breach of contract action against appellees, Chester and Jan Snapp. The appellants charge, inartfully, that the court's decision in favor of the appellees was against the manifest weight of the evidence.

In an attempt to feather their nest, as it were, the appellants decided to invest in the burgeoning, albeit risky, ostrich breeding and production industry. Ostriches are promoted as an alternative food source, and coupled with the demand for their feathers and leather, are completely consumable. The potential rewards of the investment are great: Mr. Doner stated that the hen he purchased from the appellees for $3,000 was worth at least $20,000 three years later, although she had yet to lay a fertile egg. The risks of the business include ostrich infertility and mortality.

The appellants purchased a "trio" of ostrich chicks by oral agreement from the appellees in 1990 for $9,000.[1] In breeders' parlance, a "trio" means two hens and one male. One male may mate with as many as three hens. The appellants' bid to build a nest egg suffered a bad break in early 1991, when they discovered that their "trio" consisted of two males and one hen. Mr. Doner testified that his first knowledge of the error came when the darker features and feathers of the males appeared. Mr. Snapp testified that it can be difficult to determine an ostrich's sex, and that he had advised Mr. Doner to have the birds' sex confirmed within ninety days of the sale. Mr. Doner denied that he had been so counseled.

There also was disputed testimony as to whether the appellees agreed to exchange a hen for one of the males upon learning of the alleged breach. In any event, no agreement was reached between the parties. Rather than bury their heads in the sand, the appellants traded both of their male ostriches in 1992: one to a Michigan breeder for another male of equal value, and the other to an Indiana supplier for two female chicks. Since ostrich hens do not mature sexually for three years, the younger hens have not been bred. The hen purchased from the appellees has not produced any offspring. The record indicates that the appellants also acquired another hen, now of breeding age, from the Michigan breeder. This particular hen has produced offspring.

The appellants filed suit against appellees for breach of contract on June 15, 1993. The appellants requested compensatory damages in the amount of $15,000 plus lost profits. Following appellants' answers to appellees' interrogatories and deposition of the appellants, the appellees filed a motion for summary judgment on January 25, 1994. Appellees asserted that appellants had not raised a genuine issue of material fact on the issue of liability, specifically that appellants had suffered damage from the alleged breach. The trial court sustained appellees' motion and entered final judgment thereupon on May 5, 1994. The appellants lodged this appeal on June 2, 1994.

For their lone assignment of error, the appellants state:

"The judgment in favor of the appellee[s] is against the manifest weight of the evidence because the common pleas court erred in ruling that no genuine issue of material fact, as required by Civil Rule 56(C), existed regarding the difference in value between the male ostrich delivered and a female ostrich appellee[s] was bound by the contract to deliver, and failed to do so, causing summary judgment to be entered against appellant[s]."

---

1. The appellees did not raise the Statute of Frauds below, and thus waived this affirmative defense. *Houser v. Ohio Historical Soc.* (1980), 62 Ohio St.2d 77, 79, 16 O.O.3d 67, 68, 403 N.E.2d 965, 966; Civ.R. 8(C).

Civ.R. 56 provides the familiar summary judgment standard. The Ohio Supreme Court has interpreted the rule to say:

"The appositeness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47. See Civ.R. 56(C).

In a summary judgment motion, the nonmoving party shoulders the burden to "produce evidence on any issue for which that party bears the burden of production at trial." *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus. "[S]ince the propriety of summary judgment is a question of law," *Children's Med. Ctr. v. Ward* (1993), 87 Ohio App.3d 504, 508, 622 N.E.2d 692, 695, we apply the same standard as the trial court in our review of the court's disposition of the motion; in other words, our review is *de novo.* *Id.* However, we do not weigh the evidence; we "accept the evidence properly before [us] and, with respect to the merit issues involved, construe the evidence most strongly in favor of the claims of the party against whom the motion is made." *Buckingham v. Middlestetter* (Mar. 22, 1993), Montgomery App. No. 13575, unreported, 1993 WL 81827.

We initially point out that the appellants' assignment is poorly cast. It is axiomatic that we may not determine the propriety of a trial court's grant of summary judgment by looking to the manifest weight of the evidence. "As it is not the province of a trial court in ruling on a motion for summary judgment to weigh evidence, [a] claim that the court's ruling could be 'against the manifest weight of the evidence' is a legal chimera incompatible with the concept of summary judgment." *Cincinnati v. Ohio Council 8, Am. Fedn. of State, Cty. & Mun. Emp., AFL–CIO* (1994), 93 Ohio App.3d 162, 165, 638 N.E.2d 94, 96. We also note that some courts have summarily overruled such inartfully pled assignments. See *id.; Norris v. State Teachers Retirement Sys. of Ohio* (1987), 35 Ohio App.3d 92, 95, 520 N.E.2d 5, 7. However, in the interest of fairness, we will construe appellants' assignment as positing the proper standard of review and address its merits.

 Generally, a plaintiff must present evidence on several elements to successfully prosecute a breach of contract claim. Those elements include the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. See 2 Ohio Jury Instructions (1993), Section 253.01, at 111–112. See, also, *Am. Sales, Inc. v. Boffo* (1991), 71 Ohio App.3d 168,

175, 593 N.E.2d 316, 321 (elements required for effective pleading of breach of contract action). Therefore, since damages are an essential element of the appellants' case, if the appellants were to survive summary judgment on the issue of damages, they must have presented evidence establishing a genuine issue of material fact on the that issue. *Fiorella v. Ashland Oil, Inc.* (1993), 92 Ohio App.3d 411, 414, 635 N.E.2d 1306, 1306.

■ The appellants alleged that they were entitled to compensatory damages for the difference in value between the male they received and the hen for which they bargained, and lost profits from reduced egg production. Thus, the Doners sought damages for injury to their "expectation interest"; *i.e.*, they sought to be placed in as good a position as if the contract had been performed. *Schulke Radio Prods., Ltd. v. Midwestern Broadcasting Co.* (1983), 6 Ohio St.3d 436, 439, 6 OBR 480, 482, 453 N.E.2d 683, 686; *Brads v. First Baptist Church of Germantown, Ohio* (1993), 89 Ohio App.3d 328, 338–339, 624 N.E.2d 737, 744–745. "Because damages for injury to an expectation interest are limited to actual loss, that loss must be established with reasonable certainty." *Id.* at 339, 624 N.E.2d at 745.

Furthermore, to successfully assert a claim for lost profits, a plaintiff must satisfy the tripartite test established in *Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 12 OBR 322, 466 N.E.2d 883. The Supreme Court stated that "lost profits may be recovered by the plaintiff in a breach of contract action if: profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits are not remote and speculative and may be shown with reasonable certainty." *Id.* at 244, 12 OBR at 325, 466 N.E.2d at 887. The court extended the *Combs* test to new businesses in *AGF, Inc. v. Great Lakes Heat Treating Co.* (1990), 51 Ohio St.3d 177, 183, 555 N.E.2d 634, 639. Therefore, appellants must show with "reasonable certainty" the difference in value between the ostriches bargained for and those received or their lost profits to raise a genuine issue of material fact on the issue of damages and survive summary judgment.

We find it interesting that neither the parties nor the court below referred to the Ohio Commercial Code, R.C. 1301.01 *et seq.* Granted, ostriches are not typically the subject of commercial transactions; however, they qualify as "goods" under R.C. 1302.01(A)(8). As the parties entered into a deal involving "goods," the code applies to the transaction. R.C. 1302.02. We find the statutory scheme to be of assistance in determining whether the appellants raised a genuine issue of material fact regarding their alleged damages.

Construing the evidence in favor of the appellants, the testimony in this case discloses that (1) the Doners accepted tender of the "trio" in August 1990; (2) the

Snapps represented that the birds sold were two hens and one male; (3) the appellants relied on that representation; (4) the appellants did not, and could not, discover until the following spring that they had received two males and one hen; (5) the appellants notified the appellees of the nonconformity within a reasonable time after its discovery; (6) the appellees declined to substitute another hen for one of the males; and (7) the Doners subsequently traded both males—one for another male and the other male for two hen chicks.

Two avenues of action were available to the appellants once they discovered that one of the birds was nonconforming. First, "[w]here a tender has been accepted * * * the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy * * *." R.C. 1302.65(C)(1). Once a buyer satisfies this provision, "he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." R.C. 1302.88(A).

Second, the appellants may revoke their acceptance of the goods if they accepted them "without discovery of such non-conformity if * * * acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." R.C. 1302.66(A)(2). If a buyer revokes acceptance under this provision, he assumes the same rights and duties "with regard to the goods involved as if he had rejected them." R.C. 1302.66(C). One of the rights available is "cover": purchasing substitute goods in good faith and without unreasonable delay. R.C. 1302.85(A)(1), 1302.86(A). If the buyer chooses to cover, he may recover from the seller damages measured by the "difference between the cost of cover and the contract price," plus any proven incidental or consequential damages. R.C. 1302.86(B). See R.C. 1302.89. The appellants here did not allege incidental damages.

Following either approach, it is still essential that the nonbreaching party show damages. We hold that the appellants have failed to do so. Under R.C. 1302.88(A), the loss claimed must be determined in a reasonable manner. The appellants prayed for $15,000 in compensatory damages based on their estimate of the difference in value between the hen received from the appellees and one male ostrich at the time of suit. Mr. Doner admitted that, at the time of sale, all three ostriches had the same value.[2] But he testified that the value of hens appreciates more rapidly, so that, when suit was filed, he estimated the hen was worth approximately $22,000, while the male's value was $7,000. However, Mr.

---

**2.** Mrs. Doner provided no testimony contrary to that of her husband on the issues pertinent to this appeal.

Doner testified that when he discovered the breach, in the spring of 1991, that "[t]here was hardly any price difference" between the males and the hen.

█ We think that it is unreasonable to gauge the difference in value at the time the lawsuit was filed. To subject a defendant to such a notion would place him at the mercy of a plaintiff's efforts to gain the greatest price disparity for as many as four years. R.C. 1302.98(A). This position also ignores the injured party's duty to mitigate damages. See *F. Ents., Inc. v. Kentucky Fried Chicken, Inc.* (1976), 47 Ohio St.2d 154, 159–160, 1 O.O.3d 90, 93–93, 351 N.E.2d 121, 124–125. Clearly, measure at the time of suit is not a reasonable measure of the appellants' alleged loss.

Whether it is more reasonable to assess the appellants' damages at the time of sale or when the nonconformity was discovered is irrelevant here because either method brings us to the same outcome. The appellants paid the same sale price for each ostrich—$3,000. The appellants suffered no loss in value at that time. Moreover, Mr. Doner admitted there was little if any price difference between the birds when the breach was discovered. The appellants did not claim that the value of the male ostriches ever fell below $3,000. Therefore, there was no difference in value between the ostriches in the spring of 1991 and the appellants suffered no loss in value.

█ We now consider cover as a measure of damages. When an injured buyer covers, "no damages are available where the substitute goods and services are purchased for less than the original contract between the buyer and the breaching seller." *Schultz v. Sun Plastic, Inc.* (May 23, 1990), Summit App. Nos. 14154 and 14163, unreported, 1990 WL 72333. The same outcome must apply when the buyer trades nonconforming goods for substitute goods that have an equivalent value, when the nonconforming goods have held their price or appreciated above the original contract price. This result comports with the buyer's expectation interest: to be placed in no better position than if the contract had been fulfilled. *Brads, supra,* 89 Ohio App.3d at 339, 624 N.E.2d at 745.

We realize that there are no Ohio cases which allow an aggrieved buyer to "cover" by trading for substitute goods, rather than purchasing them in the open market. But we are also aware that the code is to be "liberally construed and applied to promote [its] underlying purposes and policies." R.C. 1301.02(A). Moreover, other jurisdictions have interpreted UCC 2–712, which corresponds to R.C. 1302.86, as permitting buyers to cover without resorting to a market purchase. See, *e.g., Dura–Wood Treating v. Century Forest Industries* (C.A.5, 1982), 675 F.2d 745 (buyer permitted to "cover" out of its inventory); *Cives Corp. v. Callier Steel Pipe & Tube, Inc.* (Me.1984), 482 A.2d 852 (buyer "covered" by manufacturing substitute goods itself); *Milwaukee Valve Co. v. Mishawaka*

*Brass Mfg., Inc.* (1982), 107 Wis.2d 164, 319 N.W.2d 885 (inventory). We think that the unique circumstances of this case, when viewed in favor of the appellants, lend themselves to the belief that appellants "covered" by their trade.

Even if we treat the appellants' trade of the one male ostrich for two hen chicks as "cover," we again find that the Doners did not suffer a loss. Mr. Doner testified in his deposition that he suffered no loss in value in the trade. Mr. Doner could not place a firm value on the male ostrich at the time of the trade in 1992. He did state he believed the price range was $6,000 to $7,000, but his attempts to sell the bird for $7,000 prior to the trade were unsuccessful. In any event, in response to a question from appellees' counsel, Mr. Doner testified that he received chicks of equivalent value in the trade:

"[MR. HEMM]. What you got in place of what the Snapps sold you is two female chicks of roughly equivalent value?

"[MR. DONER]. Right."

Thus, the appellants' expectation interest was satisfied by the trade, at least to the extent of the value of the nonconforming ostrich.

■ Turning to the issue of lost profits, we again agree with the trial court that the appellants did not raise a genuine issue of material fact. Applying the *Combs* test, we find that the evidence satisfies the first two prongs of the test, but fails to meet the third prong. The testimony manifests that profits from egg production were within the contemplation of the appellees at the time of the contract to sell and that any lost profits were the probable result of the breach. *Combs, supra,* 12 Ohio St.3d at 244, 12 OBR at 325, 466 N.E.2d at 887. See, also, R.C. 1302.89(B). However, we believe the evidence indicates that the lost profits alleged by the appellants were too remote and speculative, *i.e.,* the appellants did not prove their lost profits with a reasonable certainty. See *AGF, Inc., supra,* 51 Ohio St.3d at 182, 555 N.E.2d at 638; *Combs, supra.*

The *AGF* court denoted several ways in which a new business could establish lost profits. "[W]e hold that a new business may establish lost profits with reasonable certainty through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts." 51 Ohio St.3d at 183–184, 555 N.E.2d at 640. The appellants admitted that theirs was a new venture into the relatively new business of ostrich breeding. Mr. Doner testified that he did not have any special training or education in ostrich breeding and production other than reading some books. Further, the appellants did not identify or offer any evidence such as that described by the Ohio Supreme Court in *AGF*.

What the appellants did offer by way of their own testimony is revealing:

"[MR. HEMM]. [Y]ou went on to say in your lost profits damage area that you believe that you would have had fifteen hatched out of thirty three eggs and at that point they would have been worth, I guess, fifteen times whatever figure you put on it?

"[MR. DONER]. Right.

"Q. First of all, how did you come up with the connection of the number of eggs being hatched.

"A. Just a percentage of what might be.

"Q. In fact you don't know?

"A. You may get none or you may have ninety.

"Q. And in fact the males that you bought from, that you ended up from the Snapps, you never bred them to determine whether they were good breeders or not?

" * * *

"A. No.

"Q. And the female which you still have has only been bred once and has laid eggs which were not fertile?

"A. Right.

" * * *

"Q. But you have no way of knowing whether any of the birds which you purchased from the Snapps were fertile at all, do you?

"A. No. I know she can lay eggs and that's good enough on the market to probably get twenty to twenty five out of her whether the eggs are fertile or not.

"Q. So the lost profits that you are claiming is really just you speculating based upon another female which you have?

"A. Right.

" * * *

"Q. So where's your loss?

"A. On my production.

"Q. But you don't know for sure what the production would be do you?

"A. No.

" * * *

"Q. * * * [W]hat you're claiming is your production is lost and you're basing that upon how many chicks would have been produced by looking at your

successful female, right? * * * What you're doing is trying to take the only successful female and taking her productivity and relating that to the bird you say you should have gotten from the Snapps, right?

"A. Right."

By his own admission, Mr. Doner acknowledged that the appellants' claim for lost profits was speculative. Furthermore, the appellants based their claim on the egg production of a hen received from another breeder and bred by a male ostrich also not received from the appellees. This evidence, without more, does not come close to the "reasonable certainty" required by *Combs* and *AGF*.

We hold that the appellants did not establish a genuine issue of material fact on the issue of damages. Therefore, the trial court properly granted the appellees' motion for summary judgment. Thus, we affirm the decision of the trial court.

*Judgment affirmed.*

WOLFF and FREDERICK N. YOUNG, JJ., concur.