[Cite as *Milton v. Nelson*, 2026-Ohio-1513.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| STEPHANIE L. MILTON, | CASE NO. 2025-T-0054 |
| Plaintiff-Appellant, | |
| - vs - | Civil Appeal from the<br>Newton Falls Municipal Court |
| JENNA NELSON, | |
| Defendant-Appellee. | Trial Court No. 2025 CVI 00137 |

## OPINION AND JUDGMENT ENTRY

Decided: April 27, 2026
Judgment: Affirmed

*Danamarie K. Pannella*, Holland & Muirden, Attorneys at Law, P.O. Box 345, Sharon Center, OH 44274 (For Plaintiff-Appellant).

*April L. Woodward*, 12373 Kinsman Road, Suite C111, Newbury, OH 44065 (For Defendant-Appellee).

EUGENE A. LUCCI, J.

{¶1}    Appellant, Stephanie L. Milton, appeals the order entering judgment in favor of appellee, Jenna Nelson, on Milton's claims. We affirm.

{¶2}    In 2024, Milton adopted a seven-year-old mustang mare named "Lily" through a program administered by the Bureau of Land Management. Milton contracted with Nelson for the care and training of Lily at Nelson's facility. After transferring Lily to a different facility, Milton brought a small claims action against Nelson alleging breach of contract and animal cruelty.

{¶3}    After trial, on  July 21, 2025, the court issued a judgment in favor of Nelson.

{¶4}    On appeal, Milton assigns two errors, which we address in reverse order to facilitate our discussion. In her second assigned error, Milton argues:

{¶5}    "The judgment of the Trial Court was against the manifest weight of the evidence and should be reversed."

{¶6}    "'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other."'" *Koller v. Zellman*, 2018-Ohio-2463, ¶ 31 (11th Dist.), quoting *State v. Thompkins*, 1997-Ohio-52, ¶ 24, quoting *Black's Law Dictionary* (6 Ed. 1990). "A challenge to the manifest weight of the evidence requires an appellate court to review the evidence presented 'including the reasonable inferences and the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the decision must be reversed.'" *Straight v. Straight*, 2020-Ohio-4692, ¶ 24 (11th Dist.), quoting *Chandler v. Chandler*, 2017-Ohio-710, ¶ 13 (11th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "The weight to be given evidence and witness credibility are primarily for the trier of fact." (Citation omitted.) *Straight* at ¶ 25. "The trier of fact is free to believe all, part, or none of a witness's testimony." (Citation omitted.) *Id.*

{¶7}    Here, Milton brought claims for a breach of contract and for civil liability for damages resulting from animal cruelty. "In order to be successful on a breach of contract claim, the plaintiff must provide evidence of the following: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages." *Huffman v. Kazak Bros.*, 2002-Ohio-1683, ¶ 21 (11th Dist.), citing *Doner v. Snapp*, 98 Ohio App.3d 597, 600 (2d Dist. 1994).

Case No. 2025-T-0054

{¶8} Milton brought her claim for animal cruelty under R.C. 2307.60(A)(1) and R.C. 959.13(A)(1). Under R.C. 2307.60(A)(1):

> Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

{¶9} Relevant to this appeal, R.C. 959.13(A)(1) provides:

> No person shall . . . [t]orture an animal, deprive one of necessary sustenance, unnecessarily or cruelly beat, needlessly mutilate or kill, or impound or confine an animal without supplying it during such confinement with a sufficient quantity of good wholesome food and water. . . .

{¶10} "Civil liability for damages resulting from a criminal act, pursuant to R.C. 2307.60(A)(1), does not require an underlying criminal conviction." *Machlup v. Bowman*, 2021-Ohio-4370, ¶ 18 (11th Dist.), citing *Buddenberg v. Weisdack*, 2020-Ohio-3832, ¶ 6-14.

{¶11} At trial, the evidence established that Milton and Nelson entered into a contract for Nelson to board and train Lily. The contract contained the following provisions relevant to this appeal:

> Client understands that Trainer offers no guarantee or warranty of any kind regarding Trainer's services. In particular, Client understands that while Trainer will develop a training program for Horse designed to meet Client's goals, Trainer can offer no guarantee that Client's goals will be met within the time period that Client would like, or at all. Each horse is an individual and will progress at its own rate and according to its own talents and limitations.
>
> . . .

Case No. 2025-T-0054

Horse may lose weight and suffer muscle strain or other stress- or labor-induced injuries . . . Client understands and expressly assumes all risks of putting horse in training, including the risk that Trainer and/or Trainer's shareholders, officers, directors, members, managers, employees, agents, contractors and family members (collectively, the "Trainer Parties") may be negligent. Accordingly, Client agrees to hold the Trainer Parties harmless for loss of or injury to Horse.

(Boldface omitted.)

{¶12} After the parties executed the agreement, Lily arrived at Nelson's facility on June 15, 2024. When Lily arrived, she had significant nasal discharge. Nelson put Lily in quarantine and collected a sample of the discharge to have it tested by a veterinarian. Thereafter, the veterinarian determined that Lily had strep. Lily remained in quarantine for approximately one month while she recovered.

{¶13} Milton arrived at the facility in August to visit Lily. Milton testified that Lily's "weight appeared fine at that time." Milton observed Nelson run Lily through a series of basic training behaviors.

{¶14} Milton maintained that the parties communicated less frequently from August into September. Milton testified that she requested pictures and videos during this time, but Nelson did not send her sufficient information for her to be able to gauge how Lily was progressing. In September, Milton began to question whether Lily was receiving proper training. Milton's associate, Julie Nation, who had also adopted a mustang that was initially transported with Lily, boarded her mustang at a facility owned by Nelson's colleague, MacKenzie Duncan. Nation informed Milton that her mustang had received far more advanced training than Lily.

Case No. 2025-T-0054

{¶15} In late September, Milton gave Nelson notice that she would be removing Lily from Nelson's facility. Milton recalled that Nelson called her, and Nelson seemed reluctant to let Milton remove the horse because Nelson was worried that the horse had not progressed as much as she would have liked, and she was concerned about her reputation. Milton testified that she agreed to post a message of gratitude on social media, crediting Nelson for training Lily, which seemed to appease Nelson. Milton asked Nelson to give Lily trailer training so she could be safely moved. Thereafter, Nelson sent her a video of Lily walking on to a trailer. Milton decided to engage Duncan to board and train Lily.

{¶16} On November 2, 2024, Duncan picked up Lily at Nelson's property. Duncan sent Milton photographs of Lily, who Milton maintained looked notably thin at the time. On the weekend of November 9, 2024, Milton and Nation traveled to see Lily in person. When they arrived, it was clear to Milton that Lily had lost approximately 150 pounds. Milton maintained that Lily's pelvic bones were observable, and she appeared to have muscle atrophy. In addition, Milton observed that "Lily was moving in a very stilted way, she looked unwell, her coat was not what it should have been, and in human terms, you would think that she was limping." Milton submitted to the court pictures taken of Lily after she had been moved to Duncan's facility as well as pictures of Lily taken prior to her arrival at Nelson's facility.

{¶17} Milton hired a veterinarian, who examined Lily on November 11, 2024. In the veterinarian's report, he rated Lily as a 4.5 on the Henneke Body Condition Scoring System, which is a scale with a range of 1 through 9 that is used to evaluate horse weight.

After November, Milton learned of another horsewoman who had previously boarded horses with Nelson who withdrew her horses for being underfed.

{¶18}  On cross-examination, Milton acknowledged that, at the time she received Lily, she was concerned that she was overweight. Milton reviewed a statement from the Trumbull County Humane Officer that stated a score of 4.5 on the Henneke scale is considered normal. The statement further indicated that many factors could lead to weight loss, including transportation and cold weather.

{¶19}  Following her testimony, Milton called Kaitlyn Frye as a witness. Frye testified that she adopted a mustang from Nelson in 2022. She began working for Nelson in 2023, and she was working there when Lily arrived in June 2024. While Lily was in quarantine, Frye did not see Nelson take her out of the pen to train her, nor did she see Nelson or anyone else in the pen training her. Frye began to work with Lily when she was out of quarantine. When Frye was needed for other more difficult horses, Nelson had an apprentice begin working with Lily. Frye maintained that Nelson would work with Lily once or twice a week. Eventually Lily's training was put on the "back burner" because the facility was busy with other horses. Frye believed that a horse with Lily's temperament should have been more solid with her skills after four-and-a-half months of training.

{¶20}  Further, Frye indicated that Lily was fed two flakes of hay in the morning and two flakes of hay at night. She believed that amount was fed to all of the horses, even the larger ones. Lily also received about three pounds of grain per day, but Frye maintained that Lily should have been receiving at least five to six pounds of grain, unless she was receiving extra forage.

Case No. 2025-T-0054

{¶21} On cross-examination, Frye indicated that she personally fed the horses two to three evenings per week. Frye did not believe that any animals at Nelson's facility had ever been neglected or treated with ill intent.

{¶22} Next, Milton called Shannon Larson as a witness. Larson testified that she is a professional horse instructor. She had boarded her own horses at Nelson's facility. She had grown frustrated by the lack of feed, and she supplemented her horses' diet. She eventually withdrew her horses from Nelson's facility.

{¶23} Milton next called Duncan as a witness. Duncan testified that, when she picked up Lily, she was very concerned with how Lily appeared, and she sent pictures to Milton. Duncan stated that she "could see -- like, [Lily's] hips were pointed. There was a significant dip from her spine to her tail area. She just looked bad. Her coat was dull." In addition, she believed Lily should have been doing a lot more with respect to training at that time. Duncan maintained that Lily had significantly progressed in her weight and training while under Duncan's care.

{¶24} On cross-examination, Duncan affirmed that she had no knowledge of what Lily's condition was in the wild for seven years prior to Milton adopting her. However, Duncan maintained that Lily had a form of lameness. On redirect examination, Duncan indicated that she believed the Bureau of Land Management, which monitored Lily's herd, typically euthanized lame horses in the wild.

{¶25} Last, Milton called Nation to testify. Nation maintained that she followed Lily's trailer, which was also transporting a mustang she adopted, Vinny, to Nelson's facility. On route, Lily had developed some mucus in her nostrils. Otherwise, she appeared in good condition, with a shiny coat and no difficulty in movement. After leaving

Case No. 2025-T-0054

Lily at Nelson's facility, Vinny was then transported to Duncan's facility. When Nation saw Lily again in November 2024, she noted that Lily's "hind legs looked skinny, you could see her hip bones protruding, she was not muscular but more rounded and flat in areas, her coat was very drab, it wasn't shiny. . . ." Nation also observed that Lily was having difficulty walking. Nation indicated that since Lily has been at Duncan's facility, she had progressed in regaining weight and movement, her coat was shiny, and she was responding to training.

{¶26} Following Nation's testimony, Milton rested.

{¶27} Nelson then testified in her defense. Nelson maintained that her understanding was that Lily was an unhandled mustang that was coming to her facility to be "gentled." Nelson explained that "gentling" involves changing the horse's perspective of people from that of predator to partner and teaching certain skills to the horse. She had no discussion with Milton of an expectation that Lily be lunged, saddled, or ridden within a certain timeline. Nelson had explained to Milton that she trains the horse at its own pace and does not push training. She informed Milton that there would be on average 10 to 12 training sessions per week. Nelson testified that she provides shorter sessions when gentling a mustang because, in her experience, repeated exposure is preferable to prolonged exposure.

{¶28} Nelson maintained that Lily did receive 10 to 12 training sessions per week while at Nelson's facility. Nelson was Lily's primary trainer for the first two weeks, and then her assistant trainer, Jen Politzer, was assigned as Lily's primary trainer under Nelson's supervision. In Nelson's experience, older mares tend to take the most time to adjust to domestic life.

Case No. 2025-T-0054

{¶29} Nelson further testified that, because Lily was ill with strep, which is very contagious, when she arrived, she had to be quarantined. Nelson explained that "when Lilly (sic.) was in quarantine, she had a very poor appetite, which [Nelson] communicated to Ms. Milton, but she always had 24/7 access to forage while she was sick." Lily continued to have unlimited access to hay until sometime in September, at which point she was given three-and-a-half to four flakes of hay twice per day. She also received grain twice per day. Nelson believed that Lily probably lost muscle mass while she was sick, during which time she would only eat hay, and she rejected grain, alfalfa, and other products offered to her.

{¶30} Nelson provided the court with videos of Lily recorded on October 31 and November 1, 2024. Nelson explained that the October 31, 2024 video showed Lily doing well, and she did not appear stressed or underweight. Nelson maintained that, in the November 1, 2024 video, she was interacting with Lily to demonstrate where she was with her training so that her transition would be smooth when she went to Duncan's facility.

{¶31} With respect to Frye's account of Lily's training and feeding, Nelson testified that Frye was not typically at the facility at the times when Lily would be training, and she had no feeding responsibilities. On cross-examination, when asked why Nelson's account of Lily's feeding differed from that of Frye, Nelson maintained that Frye was not being honest in her testimony. Nelson also explained that Larson and Frye brought grain to the facility because it was not included in board fees that they paid.

{¶32} Following Nelson's testimony, she called two of her employees who fed the horses while Lily was boarded at Nelson's facility. The testimony of these employees

Case No. 2025-T-0054

indicated that Lily's hay bag would be filled completely twice per day, and she would receive a "half scoop of Kalm Ultra," which is a grain, twice per day. Neither employee had concerns about Lily's condition. Neither employee had witnessed a horse at Nelson's facility that was malnourished or neglected. The employees did not know the weights of hay or grain that they fed Lily.

{¶33} Last, Nelson called Politzer as a witness. Politzer testified that she was an assistant trainer for Nelson at the time Lily was boarded at Nelson's facility. Politzer regularly worked with Lily in the gentling process two to three times per day. She also observed Nelson working with Lily. Politzer stated that Lily probably lost some weight while she was sick, but she regained the weight, and Politzer believed she looked "wonderful." Politzer also affirmed that she had never seen a horse malnourished, neglected, or abused at Nelson's facility. In her experience, older horses, such as Lily, take longer to train.

{¶34} Following Politzer's testimony, Nelson rested.

{¶35} In its July 21, 2025 judgment, the trial court concluded that there was insufficient evidence that Lily did not receive the "training or nourishment that it 'should have had' as to give rise to a breach of the contract or anything analogous to a 'cruelty' claim."

{¶36} In her second assigned error, Milton first argues that the trial court's conclusion that Nelson did not commit civil animal cruelty is against the weight of the evidence because Nelson allowed Lily to lose a significant amount of weight during her initial 30 days at Nelson's facility, which Milton maintains amounted to torture.

{¶37} However, there was no testimony establishing how much weight Lily lost in the first thirty days of boarding at Nelson's facility. Nelson testified that she believed Lily lost muscle mass during this time when she was ill, as she would eat only hay, and she rejected grain, alfalfa, and other products offered to her. Further, Milton testified that when she visited Lily in August, she was not concerned about her weight. Based on this and considering all record evidence presented, we cannot say that the trial court's ruling on this issue was against the weight of the evidence.

{¶38} Next, with respect to the breach of contract claim, Milton argues that the trial court erred in finding that Nelson sufficiently fed and trained Lily.

{¶39} However, as set forth above, Nelson testified that Lily lost muscle mass due to her illness, and she was offered additional food sources. Nelson and her witnesses testified to Lily receiving food similar to the other horses once she had recovered, and they had no concerns regarding Lily's weight. The veterinarian who examined Lily on November 12, 2024, scored her at a 4.5 on the Henneke scale with "mild muscle loss in hind end." In another portion of the veterinarian's report, he indicated that Lily's body condition score was a 4, representing "mild to moderately thin." However, that veterinarian determined that she seemed to be in overall good health. Further, the Trumbull County Humane Officer indicated that a score of 4.5 to 5 was considered "normal and ideal according to [the Humane Society's] scale," which is the Henneke Body Condition Scoring System.

{¶40} With respect to training, as set forth above, the contract specifically made no guarantees regarding training. Nelson indicated that she had informed Milton that Lily would receive training at the horse's own pace approximately 10 to 12 times per week.

Nelson and Politzer affirmed that she received this training. Based on the evidence presented, we cannot say that the trial court's decision in favor of Nelson on the breach of contract claim was against the weight of the evidence.

{¶41} Next, Milton further argues that she established damages with reasonable certainty. However, as both of her claims failed, we need not reach this issue.

{¶42} Accordingly, Milton's second assigned error lacks merit.

{¶43} In her first assigned error, Milton contends:

{¶44} "The Trial Court erred by failing to transfer the case from the small claims division to the regular municipal docket sua sponte when the issues presented required complex testimony, contract interpretation, and application of statutory law."

{¶45} In her first assigned error, Milton argues that the trial court's failure to sua sponte transfer the case to the regular docket constituted an abuse of discretion. Milton maintains that "[t]his proceeding required evaluation of veterinary evidence, contract and statutory interpretation, and competing testimony about animal welfare standards— issues far exceeding the simplified procedures of small claims, which is intended for 'ordinary, uncomplicated' disputes."

{¶46} However, Milton elected to file her complaint in the small claims division of the trial court, and she sought damages in the amount of $6,000, the jurisdictional limit for a small claims case.

{¶47} Accordingly, Milton invited any error in this case being heard in the small claims division. "'The invited error doctrine precludes a litigant from taking advantage of an error that he himself invited or induced.'" *Cronin v. Cronin*, 2012-Ohio-5592, ¶ 34 (11th Dist.), quoting *Perko v. Perko*, 2003-Ohio-1877, ¶ 23 (11th Dist.). "A party who induces

error in the trial court cannot take advantage of such error on appeal." (Citation omitted.) *State v. Watson*, 2025-Ohio-515, ¶ 40 (11th Dist.).

{¶48} Accordingly, because any error in this matter proceeding in the small claims division was induced by Milton, her first assigned error lacks merit.

{¶49} The judgment is affirmed.

JOHN J. EKLUND, J.,

ROBERT J. PATTON, J.,

concur.

Case No. 2025-T-0054

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit. It is the judgment and order of this court that the judgment of the Newton Falls Municipal Court is affirmed.

Costs to be taxed against appellant.

_____
JUDGE EUGENE A. LUCCI

_____
JUDGE JOHN J. EKLUND,
concurs

_____
JUDGE ROBERT J. PATTON,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-T-0054