DECISION
This is an appeal by plaintiff-appellant, Gerald Kucan, from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant-appellee, General American Life Insurance Company, and denying plaintiff's motion for summary judgment.
On July 26, 2000, plaintiff filed a complaint, naming as defendants General American Life Insurance Company and Great-West Life Annuity Insurance Company.[1] In the complaint, plaintiff alleged the following facts. Defendant General American Life Insurance Company (hereafter "defendant") employed plaintiff from 1990 until early 2000 as a regional sales vice-president. Throughout his employment, plaintiff was eligible for compensation under the company's Management Incentive Program ("MIP"), and he received MIP payments for the first three quarters of 1999 without incident. Defendant subsequently began experiencing economic difficulties and, in response, plaintiff decided to leave the company effective January 14, 2000.
Plaintiff alleged that, although he had completed all required work and satisfied the requisite goals to be paid the fourth quarter 1999 MIP compensation in the amount of $22,732, defendant had failed and refused to make the payment. Plaintiff further alleged that he acted as the sales representative on an agreement reached with National Steel in December 1999, for which he was entitled to receive a bonus of approximately $23,000; plaintiff contended that defendant had failed and refused to make this payment as well. Plaintiff's complaint alleged causes of action for breach of agreements, unjust enrichment and false representations.
On May 2, 2001, defendant filed a motion for summary judgment. Also on that date, plaintiff filed a motion for summary judgment. By decision filed July 24, 2001, the trial court sustained defendant's motion for summary judgment and overruled plaintiff's motion for summary judgment.
On appeal, plaintiff sets forth the following two assignments of error for review:
 1. The trial court erred by denying appellant Gerald Kucan's motion for summary judgment.
 2. The trial court erred by granting appellant [sic] General American Life Insurance Company's motion for summary judgment.
Plaintiff's assignments of error are interrelated and will be considered together. Plaintiff contends that genuine issues of fact remain as to whether defendant owed him payment for a fourth quarter incentive, as well as a sales commission. Plaintiff argues that the trial court's reliance on a guidebook for the 1999 MIP program was erroneous because that manual was not part of plaintiff's employment agreement. Plaintiff also contends that there was direct evidence that his compensation agreement was different than that found by the trial court.
An appellate court reviews a trial court's determination of summary judgment de novo in accordance with the standards set forth under Civ.R. 56(C). Abram v. Greater Cleveland Regional Transit Auth., Cuyahoga App. No. 80127, 2002-Ohio-2622. Civ.R. 56(C) states in relevant part:
 * * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor. * * *
Under Ohio law, in order to prosecute a breach of contract claim a plaintiff must present evidence of "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." Doner v. Snapp (1994), 98 Ohio App.3d 597, 600.
The evidence before the trial court on the motions for summary judgment included answers to interrogatories by defendant, affidavits submitted by defendant's employees, Nancy Pieper and Michael Ingrassia, an affidavit submitted by plaintiff, and several documents, including a copy of defendant's "1999 Management Incentive Plan." We also note that a review of the trial court's decision indicates that the trial court referenced plaintiff's deposition testimony, but such deposition was not transmitted with the record on appeal. By journal entry filed July 12, 2002, this court ordered that defendant file the deposition or a copy of the deposition with the clerk's office, and defendant has complied with this court's directive.
On July 16, 2002, plaintiff filed a motion to strike his own deposition, asserting that the deposition was never filed with the trial court and therefore should not be made part of the record on appeal. Plaintiff acknowledges that he was only recently made aware by counsel for defendant that the deposition had not been properly filed in the trial court.
Although plaintiff argues in his motion to strike that he believes the trial court "apparently" did not consider this document as part of its review of defendant's motion for summary judgment, language in the trial court's decision suggests otherwise. Specifically, in its decision the trial court twice referenced plaintiff's deposition, citing pages 13-14 of the transcript. Because we presume regularity in the proceedings, the record reflects that the trial court reviewed the transcript. We further note that defendant, in its motion for summary judgment, cited to plaintiff's deposition testimony. However, despite the fact that defendant did not properly file plaintiff's deposition in the trial court, plaintiff did not raise an objection to defendant's reliance upon the deposition testimony.
In Cooper v. Red Roof Inns, Inc. (Mar. 30, 2001), Franklin App. No. 00AP-876, we observed, "[t]his court and other courts have held that the failure to object to the propriety of evidence submitted in support of a motion for summary judgment constitutes a waiver of any alleged error in the consideration of such evidence." In Boydston v. Norfolk S. Corp. (1991), 73 Ohio App.3d 727, 731, fn. 2, the court noted that depositions attached to appellants' memorandum contra summary judgment were not properly before the court since the depositions were never filed in that court. The court held, however, that because appellees never objected to the use of such material, "the court below could consider the deposition testimony in making its decision." Id., citing McCormac, Civil Rules Practice (1991 Supp.) 85, Section 6.33. See, also, Miles v. Realty One, Inc. (May 9, 1996), Cuyahoga App. No. 69506 (rejecting plaintiff's claim that trial court erred in considering portions of plaintiff's own deposition when deposition was not filed with trial court; although transcript pages were not properly before trial court, "when a party submits materials that do not conform to the requirements of Rule 56(C) in support of a motion for summary judgment and the opposing party does not object, the trial court may consider those materials"). Here, because plaintiff failed to object to the submission of this evidence before the trial court, the trial court could have considered plaintiff's deposition testimony, and therefore this court may also consider this evidence in determining the issues on appeal. Whaley v. Zyndorf/Serchuk, Inc., Lucas App. No. L-01-1295, 2002-Ohio-2640. Accordingly, plaintiff's motion to strike his own deposition testimony is hereby denied.
In its decision, the trial court noted that one of the primary issues involved whether plaintiff's contract incorporated the terms of the MIP. The trial court found that it did, citing a copy of a letter, dated April 17, 1990, sent from defendant's vice-president of group sales to plaintiff, indicating that plaintiff's date of employment would be "[n]o earlier that May 7 and no later than June 1, 1990."
The record supports the trial court's finding that the agreement incorporated the terms of the MIP. In addition to the above language, the April 17, 1990 letter further stated in part: "[y]ou will be eligible for the Management Incentive Program beginning with the balance of the 1990 calendar year. Your target incentive com-pensation under this program will be 60% of base salary earned in a calendar year." The letter indicated that incentive payments "will be made at the end of each calendar quarter," and noted that an employee benefits summary was enclosed describing the "benefit programs to which you will be entitled."
The trial court next addressed the issue whether defendant was entitled, under the terms of either the MIP plan or the subsequent Enterprise Continuity Program ("ECP") plan, to condition awards upon the company satisfying certain financial targets and to withhold payments if an employee had resigned prior to the time of the payout. In his affidavit submitted in support of his motion for summary judgment, plaintiff averred "[i]t was never agreed that payment of the incentive or bonus portion of my compensation was contingent upon being employed with the company at the time of payment." Plaintiff further stated that, while the company changed the name of the MIP program to ECP after experiencing economic difficulties, "[m]y agreement with the company * * * was not affected as it concerned my compensation." While plaintiff acknowledged that he was paid his incentive bonus for the third quarter of 1999, he alleged that defendant wrongfully withheld his fourth quarter payment.
Plaintiff further represented that in 1999 he fulfilled all functions of a sales representative for an account sale to a company known as National Steel #6937 ("National Steel"), and that, "[u]pon the sale, I was to be paid a commission in the amount of $23,000." Defendant informed plaintiff that he would not be paid either the fourth quarter incentive payment or the commission for the National Steel account sale because "I was not employed on the date these payments were made." Plaintiff also contended that the 1999 MIP was "not part of my agreement with the company," and that this document "apparently applied to the home office and not to field personnel like me."
In defendant's answers to interrogatories, Nancy S. Pieper, a sales administrator for defendant, stated that in 1999 and 2000, plaintiff was paid a base salary of $97,200, and he was also eligible to participate in the company's MIP, under which he could receive a percentage of his salary as incentive compensation depending upon his individual performance and the financial results of the entire company. According to Pieper, this payment was dependent upon management's decision that the financial condition of the company warranted such payments, and it was also dependent upon the employee remaining employed through the date of payment in March the following year. For most eligible employees, the entire MIP payment would be paid in one lump sum at that time; however, certain highly compensated employees, including regional sales vice-presidents (hereafter "RSVPs") such as plaintiff, were paid quarterly estimated installments in advance of the March final eligibility date.
Pieper stated in interrogatories that, in fall 1999, the company's liquidity crisis resulted in a determination that no MIP payments would be made to anyone; however, plaintiff and others similar to him had already received two estimated advance quarterly payments "which the Company could have but did not ask to be refunded." In lieu of any continuing MIP program, the company instituted the ECP, intended to partially replace the lost MIP income, as well as to encourage people to remain employed with the company to facilitate the transition to ownership by Metropolitan Life Insurance Company, by providing a financial incentive to stay with defendant. In order to be eligible, one had to remain employed from October 1, 1999 through March 31, 2000. Plaintiff resigned in January and therefore he was not eligible for ECP; however, he did receive an advance installment amount but, according to Pieper, plaintiff had "no entitlement or eligibility for any other type of compensation, including any bonus or commission."
In their motion for summary judgment, defendant also submitted an affidavit of Pieper, in which she averred that, in fall 1999 it was announced by Richard Liddy, the company's Chairman and President, that no MIP payments would be made for 1999 due to the company's condition, and that no such payments were made. Pieper also averred that, after the company implemented the ECP plan, payments were made in April 2000 to employees who satisfied the requirement that they remain employed through March 31, 2000, but no payments were made to those who resigned or were terminated prior to that date. Part of the evidence on summary judgment included a document, dated October 20, 1999, from Liddy to all associates of defendant regarding the ECP program. In describing the characteristics of the ECP plan, the document states in part: "If you voluntarily discontinue your employment or you are terminated for any reason other than job elimination or staff reduction prior to March 31, 2000, you will not receive any award under the ECP."
The evidence before the trial court on summary judgment also included a copy of the 1999 MIP plan, which states in part: "No MIP awards will be paid if the company fails to meet minimum financial performance." That document also states: "If you leave the company before awards are determined and paid, you will forfeit your right to any award for that plan year." In her affidavit Pieper stated that she sent a copy of the 1999 MIP to plaintiff and other RSVPs on January 20, 1999. Pieper further averred that, "[a]s stated on page 3 of the Plan, the Plan applied to all salary bands 9 and above, which included Regional Sales Vice Presidents (who were generally at salary band 11)."
In support of their motion for summary judgment, defendant also submitted the affidavit of Michael Ingrassia, vice-president of sales. Ingrassia stated in his affidavit that all RSVPs reported to him, and he averred the following facts regarding the manner of compensation for RSVPs. The sole compensation of RSVPs has been a combination of a base salary plus participation in a bonus incentive plan, and RSVPs "are not eligible for commissions on individual sales but instead are compensated based on performance of their regions and their personal performance rating" as RSVPs. During the time plaintiff was employed as an RSVP, he was "eligible for and participated in annual Management Incentive Plans * * * the terms of which were set forth in an annual published plan. This plan applied to R.S.V.P.s as well as other levels of sales at salary grades 9 and above," and "[t]here was no separate plan for those in Field Sales," including RSVPs, as "all were subject to the same terms and conditions of the plan published each year." In 1999, RSVPs received advance payments under the 1999 MIP plan after the first and second quarters, but the company President, Liddy, then announced that there would be no payments under the MIP because of financial difficulties. Liddy announced a new plan at that time, the ECP, which would provide incentive for RSVPs and others to stay throughout the sale and transition of that segment of the business to Metropolitan Life Insurance Company. According to Ingrassia, this was the "only plan applicable to R.S.V.P.'s, and expressly required that R.S.V.P.'s (and others) remain employed through March 31, 2000 to be eligible under the plan."
An advance payment was made in 1999 under the ECP plan to RSVPs, with the amount based upon a percentage of annual compensation. In an e-mail dated November 12, 1999, Ingrassia explained to RSVPs that the amount of the incentive compensation was fixed and would be paid regardless of actual production of the RSVPs' region, "unlike before," and "R.S.V.P.'s (also known as Field Sales Vice-Presidents) were `eligible to receive guaranteed MIP payment equal to 60% of base pay,' instead of being an uncertain or unfixed amount."
When plaintiff submitted his resignation effective January 2000, plaintiff phoned Ingrassia to ask about his incentive compensation. Ingrassia "reemphasized to [plaintiff] that the plan required that he remain employed through March 31, 2000 to be eligible." Plaintiff requested an exception, and Ingrassia contacted an executive vice-president. Following this discussion, Ingrassia informed plaintiff that no exception could or would be made since the entire purpose of the terms of the plan was to retain senior and other sales staff through the transition period. According to Ingrassia, "[n]o member of the Sales staff, including the Field Sales Organization, who resigned prior to March 31, 2000, received a final payment under the ECP Plan."
In the present case, the trial court found that, under the terms and conditions of the MIP plan, defendant would only make awards if the company satisfied financial targets and the employee remained employed at the time of the payout. The trial court found that plaintiff was not entitled to an award for the fourth quarter of 1999 because neither condition was satisfied. Upon this court's de novo review of the evidence, as outlined above, we agree with the trial court's determination.
In Rodgers v. Custom Coach Corp. (June 22, 2000), Franklin App. No. 99AP-1167, this court held in part:
 "Absent a contract for future commissions, an employee is not entitled to post-employment commissions on previously generated business." * * * "Simply because a commissioned employee through his or her efforts makes a company more profitable does not entitle that person to post-employment commissions. Such a result would be tantamount to giving the employee a perpetual equitable share of that company's earnings." * * *
In the present case, defendant supported its motion for summary judgment by pointing to a lack of evidence that plaintiff entered into an agreement to receive the payments he seeks. The materials offered by plaintiff failed to indicate any evidence of a written document, other than the MIP and ECP plans, pertaining to terms for payment. Plaintiff acknowledged that the requirement that a worker be employed from October 1, 1999 to March 31, 2000, was applicable to all ECP payments, and he based his claim upon "impressions that were provided to me based on how the bonus payment was calculated." (Plaintiff Depo., at 31.) In Weiper v. W.A. Hill Assoc. (1995), 104 Ohio App.3d 250, 258, this court rejected a similar argument in which the plaintiff testified that it was his "understanding" and "impression" that commissions were to continue post-employment despite the fact plaintiff could not identify any specific oral promise or word to that effect. Id. This court held that plaintiff's "subjective expecta-tions are not sufficient to give rise to an implied contract for postemployment commissions absent some colorable evidence" of the employer's assent. Id.
The trial court also determined that plaintiff was not entitled to a sales commission for the work on the National Steel account. Plaintiff stated in his affidavit that he was the sales representative for the account, and that the sales bonus was earned and due on January 1, 2000. The trial court found, however, that plaintiff's employment agreement did not provide for such commissions.
As previously noted, in answers to interrogatories, Pieper stated that no other RSVPs had ever been paid sales commissions and sales bonuses as such, but, instead, these employees are compensated and rewarded for sales results through the incentive program. In response to whether two other employees, Steve Behan and Steve Lacase, had ever been paid sales bonuses and commissions, defendant represented that both of these individuals received the normal compensation to which they were entitled while employed as field sales staff, but not when they were RSVPs, including periods during which both individuals were in the position of "Regional Sales Manager A," although they were referred to as RSVPs in the market place. Defendant stated that when both Behan and Lacase became RSVPs, they were not paid any sales commissions or bonuses but only incentive compensation under the MIP plan. Further, when both of these individuals requested to, and did, return to field sales positions, they were returned to the sales incentive compensation plan pertaining to field sales staff.
Pieper also indicated in her affidavit that RSVPs are paid a base salary plus additional compensation as provided in the MIP, but that no RSVP "is entitled to or has been paid a commission for an individual sale, regardless of their participation in making a sale." Pieper averred that it was expected that RSVPs "will assist in sales and are compensated at a level that is based on all sales in the region, including those produced through their own efforts, unlike individual representatives who are paid commissions on individual transactions."
We conclude that the trial court properly held that there were no genuine issues of material fact concerning the payment of a sales commission for work performed on the National Steel sale. As noted by defendant, plaintiff has pointed to no document containing any provision for such a commission. Further, plaintiff acknow-ledged that "[u]nder normal circumstances" RSVPs do not receive compensation outside of the normal base salary and MIP plan. (Plaintiff Depo., at 41.) When asked whether he knew of any instance in which an RSVP was paid under the circumstances he was "talking about," plaintiff responded, "[n]ot under the circumstances I'm talking about." (Plaintiff Depo., at 41.) Thus, while plaintiff may have had a subjective belief that he was entitled to the commissions at issue, the record fails to provide any objective evidence to support such a claim.
In addition to finding no evidence of an express or implied contract, the trial court held that plaintiff had failed to create a genuine issue of material fact as to a claim for unjust enrichment. Plaintiff asserted that it would be unjust for defendant to withhold the MIP award because defendant "guaranteed" the payment.
In order to prevail upon a theory of unjust enrichment, a plaintiff must establish the following three elements: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under the circumstances where it would be unjust to do so without payment." Rodgers, supra.
In support of his claim, plaintiff pointed to a memorandum from a supervisor, Carol Haney, dated October 28, 1999, which plaintiff contends confirms payment for the third and fourth quarters of 1999. The trial court noted that the letter merely provides a calculation of the payout for the third quarter of 1999. The trial court held that, while the letter indicates a balance due "that assumes a payout for fourth quarter of 1999 * * * [t]he Court does not consider this letter evidence that [defendant] guaranteed a payout for the fourth quarter." We agree with the trial court's determination that this letter does not create a genuine issue of material fact regarding a guarantee of a fourth quarter payout.
Plaintiff also submitted an e-mail message from Ingrassia that, plaintiff contended, represented evidence of a guarantee. In the message, Ingrassia stated that RSVPs are "eligible to receive guaranteed MIP payment equal to 60% of base pay." In his affidavit, Ingrassia indicated that he explained to RSVPs in the e-mail that the amount of the incentive compensation was fixed and would be paid regardless of actual production of the RSVP's region, "unlike before." He also indicated in the e-mail that RSVPs "were `eligible to receive guaranteed MIP payment equal to 60% of base pay,' instead of being an uncertain or unfixed amount. However, as stated in the ECP plan itself, no payment would be made if the R.S.V.P. did not remain through March 31, 2000."
The trial court held that it was not unjust for defendant to withhold the MIP payment since eligibility was determined under the terms and conditions therein, and in the instant case plaintiff failed to satisfy those terms and conditions because he left before the payout was due. We agree with the trial court's determination that plaintiff cannot prevail on an unjust enrichment claim because, in the absence of fraud or bad faith, recovery under an unjust enrichment claim is unavailable where the matters in dispute are governed by the terms of an express contract. Rumpke v. Acme Sheet Roofing, Inc. (Nov. 12, 1999), Montgomery App. No. 17654. See, also, Hunting Valley Builders, Inc. v. Women's Federal Savings Bank (Aug. 23, 1990), Cuyahoga App. No. 57439 ("The courts of this state have refused to find unjust enrichment in cases where the parties have acted pursuant to the terms of a contract, and where there has been no showing of fraud or bad faith").
Based upon the foregoing, plaintiff's first and second assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed; motion to strike denied.
KLATT, J., concurs.
BRYANT, J., concurring separately.
[1] Great-West Life Annuity Insurance Company was subsequently dismissed voluntarily from the case.