OPINION
{¶ 1} Defendants-appellants, Ross and Kathleen Granger, appeal from a jury award of $90,000 in favor of plaintiff-appellee, R.T. Builders, Inc., on appellee's claims for breach of contract and conversion and appellants' counterclaim for breach of contract in the Mahoning County Common Pleas Court.
 {¶ 2} Appellants entered into a contract with appellee's president, Richard Troiano, for the construction of a home in North Lima, Ohio. The contract price was $374,325. The parties signed a payout schedule that set out the amount appellants would pay appellee based upon various levels of completion of the contract. The schedule provided for five payments of specific amounts upon the completion of certain percentages of completion and specific tasks such as framing with shingles, electric and plumbing work, and interior painting.
 {¶ 3} Appellants financed their construction loan through Farmers National Bank. Under the payout schedule, one of the parties had to contact the bank to request a draw on the loan. An appraiser would then inspect the house to ensure the proper work was completed. Upon the appraiser's approval, the bank would then forward the appropriate funds to appellee upon one of appellants' signatures.
 {¶ 4} Appellants authorized payments for the first two draws in full. When it came time for the third draw, appellants did not want to pay appellee the full amount because the concrete garage floor had been damaged by Fagan Lumber (Fagan). Appellee repaired the damaged concrete. Nonetheless, due to the concrete damage, appellants authorized the payment of the third draw minus $3,000, which was the amount to replace the concrete.
 {¶ 5} Appellee requested the fourth draw on or about November 9, 2000. The appraiser's inspection revealed that, at the time, construction was 88 percent complete. Under the payment schedule, 85 percent completion was required for appellee to receive the fourth draw. The amount of the fourth draw on the payment schedule was $78,608.25. However, appellee requested $82,000. This created a dispute between the parties. Based upon the 88 percent completion, the bank was willing to pay appellee $92,838. However, appellants would not authorize payment.
 {¶ 6} One of the items listed on the payment schedule for appellee to receive the fourth draw was that the kitchen cabinets were to be installed. However, as of November 10, appellee had not yet installed the cabinets. The allowance for the cabinets was $14,000. Mr. Granger stated that he would not authorize payment because he believed appellee was not going to complete the construction of the home. However, Mr. Granger also testified that although he and his wife looked at cabinets in the summer, they did not order the cabinets until October 2. Appellee claimed that because of appellants' delay in ordering the cabinets, there was no way they could be installed by November 10.
 {¶ 7} Appellants believed that appellee was not going to pay for the cabinets with the fourth draw and had additional concerns about how appellee was financing the job. They requested additional financial information from appellee, but claim none was provided.
 {¶ 8} Appellee never did any work on the house after November 10. It filed a suit against appellants alleging breach of contract and conversion. The conversion claim stemmed from the damaged concrete. Apparently, appellee repaired the damage caused by Fagan. Fagan later issued a check to appellants for $3,000 with a release regarding the damage it had caused. Appellants cashed this check but never paid the money to appellee. Additionally, as mentioned above, they withheld $3,000 from the third draw due to the concrete damage. Appellee claimed therefore, that it was entitled to $3,000 on a conversion claim. Appellants subsequently filed a counterclaim for breach of contract alleging appellee failed to complete construction.
 {¶ 9} The case proceeded to a jury trial. Appellants moved for a directed verdict, which the court overruled. The jury returned a verdict in favor of appellee for $90,000. The court entered judgment on the verdict on May 21, 2004. Appellants filed a motion for a new trial or a judgment notwithstanding the verdict. The trial court overruled appellants' motions. Appellants subsequently filed a notice of appeal on June 30, 2004.
 {¶ 10} Appellants raise three assignments of error, the first of which states:
 {¶ 11} "THE JURY FINDING THAT APPELLANTS BREACHED THE CONTRACT WAS CONTRARY TO LAW AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 12} Appellants argue that the jury's verdict on appellee's breach of contract claim was contrary to law and against the weight of the evidence. They contend that this case involved the interpretation of an unambiguous contract and payment schedule. Appellants argue that the payment schedule controlled the payouts. They contend that appellee's entire case is based on the statement by the banker that the bank would have authorized a payment of up to $92,000 based on the percentage of completion as determined by the appraiser. However, appellants argue, appellee did not have a contract with them to be paid in that way. Since appellee had not yet completed all of the requirements for the fourth draw, which included the installation of the kitchen cabinets, appellants contend it was not entitled to the fourth draw pursuant to the terms of the payment schedule.
 {¶ 13} Appellants further argue that when they asked for assurances regarding the financing for the remainder of the work, appellee refused. They claim that they were fearful that appellee did not have sufficient funds to finish the contract.
 {¶ 14} Thus, appellants contend that when appellee refused to return to work after November 10, it breached the contract, not the other way around.
 {¶ 15} A judgment supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. Willett v. Felger (Mar. 29, 1999), 7th Dist. No. 96C-P-40; Gerijo, Inc. v. Fairfield (1994),70 Ohio St.3d 223, 226, 638 N.E.2d 533. Furthermore, in considering whether a judgment is against the manifest weight of the evidence, it is important that this court be guided by the presumption that the findings of the trier of fact are correct. Seasons Coal Co., Inc. v. Cleveland
(1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. If the evidence is susceptible to more than one interpretation, we must construe the evidence consistently with the trial court's judgment. Gerijo,70 Ohio St.3d at 226.
 {¶ 16} To prevail in a breach of contract case, the plaintiff must prove the existence of a contract, the plaintiff's performance under the contract, the defendant's breach, and damages. Doner v. Snapp (1994),98 Ohio App.3d 597, 600, 649 N.E.2d 42.
 {¶ 17} The contract between the parties provides that appellee will build a house for appellants on West South Range Road in Beaver Township. It provides the purchase price. It also refers to spec sheets for supplemental terms and provisions. As to payment, the contract states: "Builder to be paid in draws as agreed to by Lender (See Cost Breakdown/Payout Schedule)[.] Home to be built according to plans and spec sheets held by Lender." (Pt. Ex. 2). The contract is signed by all parties and dated April 11, 2000.
 {¶ 18} The payment schedule is signed by the parties and dated May 10, 2000. (Pt. Ex. 3). It provides in full:
 {¶ 19} IT IS AGREED BY BOTH PARTIES THAT DRAWS WILL BE PAID UPON COMPLETION OF EACH SEGMENT OF CONSTRUCTION
 {¶ 20} SALE PRICE $374,325.00
 {¶ 21} Permits, survey, excavation and foundation 15% $56,148.75
 {¶ 22} Framing with shingles, windows, exterior doors 28% $104,811.00
 {¶ 23} Concrete floors, rough in heating, electric and plumbing, drywall fireplace 21% $78,608.25
 {¶ 24} Exterior siding, gutters, trim garage doors, kitchen cabinets counter tops, vanities, well 21% $78, 608.25
 {¶ 25} Interior paint, stain, varnish Driveway, walkway, patio, finish grade Finish heating, plumbing, electric and flooring, septic 15% $56,148.75
 {¶ 26} Appellants contend that appellee had to complete all of the specific items listed in each segment in order to receive the correlating draw. Appellee contends that it only had to complete the percentage of construction that correlated with each draw in order to receive the draw. The testimony revealed the following.
 {¶ 27} Mark Graham, the bank's loan administrator, testified regarding the procedure upon a draw request. He stated that upon a draw request, the bank would send out an appraiser to inspect the home and report how far along the construction had progressed. (Tr. 25). If construction progression was satisfactory to the bank, it would advance the requested funds to the builder with the buyer's approval. (Tr. 252-6). Graham testified that common practice was to make payments based either on completion of specific items or percentage of work completed. (Tr. 29). Graham stated that he looked to the payout schedule as a guide for payment. (Tr. 97). He stated that he relied on the appraiser and that his responsibility was to ensure that the overall project was only paid based on the percentage of completion. (Tr. 97).
 {¶ 28} The items listed to be completed for the first draw were permits, survey, excavation, and foundation. These items were completed when appellee requested the first draw. (Tr. 27-28). But according to the payout schedule, 15 percent completion was also required in order for appellee to earn the first draw. However, the appraiser found that construction was only 13 percent complete. (Tr. 27; Pt. Ex. 6). Nonetheless, appellants authorized payment of the first draw. (Tr. 28).
 {¶ 29} The items listed to be completed for the second draw were framing with shingles, windows, and exterior doors. However, the bank appraiser, upon inspection of the house for draw two, found that these tasks were not yet completed. (Pt. Ex. 6). The appraiser relied on a point system to determine the percentage of completion of the house. For example, the appraiser allotted three points total for the roof. At the time appellee requested the second draw, the appraiser gave the roof a 1.5. (Pt. Ex. 6). Thus, he found that the roof was only half complete. Additionally, the exterior doors and windows were allotted five points. At the time appellee requested the second draw, the appraiser gave this item a four. (Pt. Ex. 6). Thus, he found that the windows and doors were almost complete. Appellants authorized the full amount of the second draw without any problems. (Tr. 30, 667).
 {¶ 30} The items to be completed for the third draw were concrete floors, rough in heating, electric, and plumbing, drywall, and the fireplace. Looking at the appraiser's report, all items were completed except for the fireplace, which received a 2.5 out of three. (Pt. Ex. 6). Appellants authorized payment of the third draw to appellee minus $3,000 for damage caused to the garage floor by Fagan. (Tr. 130).
 {¶ 31} Looking at the way the first three draws were handled, it appears that all involved relied on the payout schedule as a guide for payment, like Graham testified. The schedule was not strictly adhered to. Mrs. Granger testified that she never saw the appraiser's report and did not rely on it. (Tr. 668). However, if the items were not complete, it should have been apparent to appellants.
 {¶ 32} Furthermore, the contract provided that appellee was to be paid in draws as agreed to by the bank and pursuant to the payout schedule. The bank's agents testified that the bank was willing to pay appellee approximately $92,000 for the fourth draw with appellants' approval. However, appellants refused to authorize payment.
 {¶ 33} Graham testified that when appellee made the fourth draw request, the bank inspector found appellee had completed 88 percent of the house. (Tr. 37). According to the payout schedule, appellee was required to complete 85 percent for the fourth draw. Based on the appraiser's report and percentage of completion, the bank was willing to pay appellee approximately $92,000 for the fourth draw. (Tr. 40).
 {¶ 34} Thomas Supko, appellants' lending associate, corroborated Graham's testimony. He stated that, based on the appraiser's report, the bank was willing to pay appellee approximately $92,000 on the fourth draw as long as appellants authorized it to do so. (Tr. 146, 148). However, appellants instructed it not to disburse any more money to appellee at that time. (Tr. 149). Supko stated appellants also requested financial information. (Tr. 149). He faxed appellants a ledger sheet showing the amount of funds that had been disbursed up to that point, a copy of the draw schedule with notes by the amounts that had been distributed, and a copy of the appraiser's inspection report showing 88 percent completion. (Tr. 149). Supko stated that if the bank paid appellee $92,000 for the fourth draw, it would have left approximately $46,000 available under the loan to complete the house. (Tr. 150). After receiving this information, Supko stated that appellants told him not to pay appellee anything. (Tr. 150-51).
 {¶ 35} A major issue with the fourth draw was the kitchen cabinets. The cabinets were listed on the payout schedule as one of the items to be completed for the fourth draw. According to Troiano, he had not yet installed the cabinets because they had not yet been delivered to the house. (Tr. 329). This he blamed on appellants. Mr. Granger testified that they went to pick out cabinets in late June at appellee's direction. (Tr. 252). However, he claimed that appellee never told them to order the cabinets. (Tr. 253). The cabinets were not ordered until October 2. (Tr. 257-58). Mr. Granger testified that was when appellee told him to order them. (Tr. 258). But Troiano stated that he sent appellants to order the cabinets when the house was still in the framing stages. (Tr. 326).
 {¶ 36} The absence of the kitchen cabinets when appellee requested the fourth draw seems to have played a large role in appellants' concerns with appellee. Mrs. Granger testified that she and her husband were concerned that appellee would not have enough money to complete the house because many things were unfinished at that point. (Tr. 604-605). She mentioned numerous items, in addition to the missing cabinets, that were not yet completed and should have been completed according to the payout schedule including cement on the outside of the house, bathroom vanities were not installed, spindles and railing were not complete, and the veranda was incomplete. (Tr. 604).
 {¶ 37} Mrs. Granger stated that when appellee requested the fourth draw, she offered to pay him $64,000, which was the amount listed on the payout schedule minus $14,000 for kitchen cabinets that had not yet been installed. (Tr. 605). Mrs. Granger testified that she was fearful that appellee would take the money and not finish the house. (Tr. 608). She testified that Troiano was very evasive and had not been returning her calls. (Tr. 609).
 {¶ 38} Mrs. Granger stated that she never received a notice from appellee that it quit, but appellee never came back to the house after November 10. (Tr. 609, 674). Troiano testified that appellee never quit the job. (Tr. 341). However, Troiano's attorney sent a letter to appellants. It stated appellee would not perform any additional work on the house until it received a payment of $85,000, which appellee had already earned. (Pt. Ex. 44).
 {¶ 39} Based on the above, appellee presented competent, credible evidence that appellants breached the contract when they refused to pay him on the fourth draw. Given our highly deferential standard of review, even "some" evidence is sufficient to sustain the court's judgment and prevent a reversal. Barkley v. Barkley (1997), 119 Ohio App.3d 155, 159,694 N.E.2d 989. The rationale for this deference is that the jury is best able to view the witnesses and observe their demeanor, gestures, voice inflections, and use these observations in weighing the witnesses' credibility. Perry v. Dearth (July 26, 2000), 4th Dist. No. 99-CA-26, citing Seasons Coal Co., Inc., 10 Ohio St.3d at 80. The evidence demonstrated that appellee performed a significant amount of work for which appellants never compensated it. Instead, they refused to pay appellee when a disagreement arose between them. Given such evidence and our presumption that the jury's findings are correct, we cannot conclude that the verdict was against the weight of the evidence. Accordingly, appellants' first assignment of error is without merit.
 {¶ 40} Appellants' second assignment of error states:
 {¶ 41} "ASSUMING WITHOUT CONCEDING THAT APPELLANTS BREACHED THE CONTRACT, THE JURY AWARD OF DAMAGES WAS CONTRARY TO LAW AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 42} Appellants argue that if we conclude that they breached the contract, the jury award was excessive on this claim. They assert appellee was required to submit evidence of what performance through the fourth draw cost it, what the cost of completing the contract would have been, and what its lost profits were. Appellant assert that at the most, appellee was entitled to: contract price minus payments received, cost of allowances, cost of stone mason paid, and cost of other subcontractors paid by appellants. They contend that amount is $57,085.
 {¶ 43} On the other hand, appellee argues that $92,838 was the amount needed to place it in the position it would have been in had appellants not breached the contract. It asserts that this figure is appropriate because the appraiser concluded this amount was owed to appellee since 88 percent of the work had been completed. Because it submitted evidence that it had performed work according to the contract, appellee contends that it is entitled to payment for that work pursuant to the contract.
 {¶ 44} When reviewing an award of damages, an appellate court will not disturb the award as long as it is supported by competent, credible evidence. Bemmes v. Public Emp. Retirement Bd. (1995),102 Ohio App.3d 782, 788, 658 N.E.2d 31.
 {¶ 45} Appellants do not take issue with the jury award for the conversion claim. However, there was only one verdict form. It stated that on plaintiff's breach of contract claim and conversion claim, the jury found in favor of plaintiff in the amount of $90,000. Furthermore, there were no interrogatories asking the jury to apportion its award between the two causes of action. Thus, it might seem that we do not know how much of the award was for breach of contract and how much was for conversion. However, appellee's conversion claim was specifically for the conversion of $3,000. Thus, without separate verdict forms or interrogatories, we can conclude that $3,000 was for the conversion and $87,000 was for the breach of contract.
 {¶ 46} Appellants cite to Allen, Heaton McDonald v. Castle FarmAmusement Co. (1949), 151 Ohio St. 522, 86 N.E.2d 782, for the proper measure of damages in a breach of contract case. In Allen, Heaton McDonald, the Ohio Supreme Court held:
 {¶ 47} "1. Where a defendant's repudiation of a contract, before the plaintiff's substantial performance, relieves plaintiff of the obligation of further performance, plaintiff is not entitled to recover as such the unpaid part of the full compensation which the contract provided he should receive for such further performance. In an action on the contract, plaintiff is entitled only to recover damages for defendant's breach of contract. Such damages may include the further compensation plaintiff would have received under the contract if it had been performed, less the value to plaintiff of his being relieved of the obligation of completing performance.
 {¶ 48} "2. Where a plaintiff sues on a contract to recover the amount he would have received for the full performance thereof which was prevented by a defendant's breach, he seeks in effect to recover as damages the profit from performance of the contract that defendant's breach prevented him from earning.
 {¶ 49} "3. In such a case, plaintiff has the burden of alleging and proving not only (a) what he would have received under the contract from the performance so prevented, but also (b) what such performance would have cost him (or the value to him of relief therefrom). Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract." Id. at paragraphs one, two, and three of the syllabus.
 {¶ 50} Based on this law, appellants claim appellee was required to offer evidence of the costs to produce the fourth draw, the value of his relief from further performance, and his lost profits. But appellants appear to be incorrect in their reading of Allen, Heaton McDonald. In that case, the Court stated that the plaintiff is not entitled to recover "the unpaid part of the full compensation which the contract provided he should receive for such further performance." (Emphasis added.) Id. at paragraph one of the syllabus. The Court then specifically limited paragraphs two and three of the syllabus to instances where the plaintiff seeks to recover the amount he would have received for full performance of the contract.
 {¶ 51} Here, however, appellee did not seek to receive the full amount he would have received for full performance of the contract. It only sought to receive payment for the work it had completed, or 88 percent of the contract. Since appellants had already paid appellee $236,568 for 64 percent completion of the house, appellee only sought what it was owed for 24 percent of completion or $89,838.[1]
 {¶ 52} Graham and Supko both testified that the appraiser found the house to be 88 percent complete. (Tr. 37-40, 146). And they both testified that, based on the appraisal, the bank was willing to pay appellee approximately $92,000 for work he had completed on the house. (Tr. 37-40, 146). Additionally, the appraiser's report corroborated their testimony. (Pt. Ex. 6). Thus, competent, credible evidence supports the jury's award.
 {¶ 53} Accordingly, appellants' second assignment of error is without merit.
 {¶ 54} Appellants' third assignment of error states:
 {¶ 55} "IT WAS ERROR TO PRESENT THE ISSUE OF CONVERSION TO THE JURY. DEFENDANTS' MOTION FOR DIRECTED VERDICT AND NEW TRIAL SHOULD HAVE BEEN SUSTAINED."
 {¶ 56} Here, appellants argue that the trial court should have sustained their motion for a directed verdict on appellee's conversion claim. They contend that the facts of this case do not fit the definition of conversion. Appellants assert that this case was merely a breach of contract case. They argue that since they were the insureds, they were the only ones entitled to the insurance check from Fagan's insurance company. They assert that in order to prevail, appellee would have had to present evidence that they were obligated to deliver the insurance check to it.
 {¶ 57} An appellate court reviews a trial court's ruling on a motion for directed verdict de novo because it presents a question of law. Peamv. Daimler Chrysler Corp. (2002), 148 Ohio App.3d 228, 240,772 N.E.2d 712. A motion for directed verdict tests the sufficiency of the evidence at trial, not the weight of such evidence or the credibility of witnesses. Id. The court shall grant a motion for a directed verdict when, "after construing the evidence most strongly in favor of the party against whom the motion is directed, [it] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4). And like a motion for a directed verdict, a motion for JNOV tests the legal sufficiency of the evidence and, therefore, presents a question of law that is reviewed de novo. Julian v. Creekside HealthCenter, 7th Dist. No. 03-MA-21, 2004-Ohio-3197, at ¶ 8.
 {¶ 58} As stated by the court in Tabar v. Charlie's Towing Serv.,Inc. (1994), 97 Ohio App.3d 423, 427-28, 646 N.E.2d 1132:
 {¶ 59} "Conversion is the wrongful control or exercise of dominion over property belonging to another inconsistent with or in denial of the rights of the owner. In order to prove the conversion of property, the owner must demonstrate (1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) that the possessor refused to deliver the property to its rightful owner. The measure of damages in a conversion action is the value of the converted property at the time it was converted." (Internal citations omitted.)
 {¶ 60} We must determine whether appellee presented sufficient evidence as to these elements.
 {¶ 61} In January 2001, Mr. Granger received a check for $3,000 made out to him and his wife from Fagan. (Tr. 266-67). Attached to the check was a release, which both appellants signed. (Tr. 267). Appellee obtained a copy of the signed release. He then sent a letter to the bank dated January 31, 2001. Enclosed was a copy of the release signed by appellants. (Pt. Ex. 12). The letter demanded that the bank release the $3,000 it was holding to appellee. A copy of the letter was sent to appellants.
 {¶ 62} Regarding the $3,000, Mr. Granger testified as follows:
 {¶ 63} "Q You had already got your $3,000, hadn't you?
 {¶ 64} "A We withheld $3,000, yes.
 {¶ 65} "Q Now, this is an extra 3,000, isn't it?
 {¶ 66} "A Yes.
 {¶ 67} "Q You knew that check, that $3,000 check, belonged to this gentleman right here (indicating), Rich Troiano, didn't you?
 {¶ 68} "A I was advised to put it in the bank.
 {¶ 69} "Q I'm not asking what you were advised. I'm asking if you knew that that $3,000 belonged to Rich, Rich Troiano?
 {¶ 70} "A It didn't say anything on that check to hand to Rich Troiano.
 {¶ 71} "Q Did it need to say this is Rich Troiano's for you to know that that was Rich's money?
 {¶ 72} "A No.
 {¶ 73} "Q You knew it belonged to Rich, didn't you?
 {¶ 74} "A Yes." (Tr. 268-69).
 {¶ 75} Despite his admission that he knew the $3,000 belonged to appellee, Mr. Granger admitted that he deposited the check into his personal checking account and used the money for his house. (Tr. 269-272). Additionally, appellee testified that he was never reimbursed for the $3,000. (Tr. 351). And appellee testified that he tried to get the $3,000 from appellants, once Fagan issued the check, by sending demand letters to appellants and the bank. (Tr. 346, Pt. Ex. 12)
 {¶ 76} Appellants allege that this case was purely a breach of contract case. However, appellee presented competent, credible evidence that appellants exerted control over $3,000 belonging to appellee in denial of appellee's rights to the money. Accordingly, appellants' third assignment of error is without merit.
 {¶ 77} For the reasons stated above, the trial court's judgment is hereby affirmed.
Vukovich, J., concurs.
DeGenaro, J., concurs in judgment only.
[1] While the bank authorized approximately $92,000, this seems to include the $3,000 at issue in the conversion claim that appellants withheld from appellee in the third draw.