[Cite as *Lasky v. Ohio State Univ.*, 2011-Ohio-4838.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

LARRY C. LASKY, M.D.

     Plaintiff

     v.

THE OHIO STATE UNIVERSITY, et al.

     Defendants
     Case No. 2007-07647

Judge Alan C. Travis

<u>DECISION</u>

{¶1} Plaintiff filed this action alleging breach of an employment agreement. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability. The parties filed post-trial briefs in lieu of closing arguments.

{¶2} As an initial matter, plaintiff filed his complaint on September 20, 2007, and an amended complaint on October 16, 2007. Defendants argue that some of plaintiff's claims are barred by the statute of limitations. The court agrees.

{¶3} R.C. 2743.16(A) provides that "civil actions against the state permitted by sections 2743.01 to 2743.20 of the Revised Code shall be commenced no later than two years after the date of accrual of the cause of action or within any shorter period that is applicable to similar suits between private parties." Inasmuch as plaintiff filed his original complaint on September 20, 2007, any claims accruing prior to September 20, 2005, are barred by the statute of limitations.

**EMPLOYMENT AGREEMENT**

{¶4}   On November 1, 1993, plaintiff, Larry Lasky, M.D., began employment as both a tenured-associate professor of pathology and a physician faculty member. Pursuant to the employment agreement, dated August 24, 1993, Dr. Lasky was expected to perform a full range of duties including service, teaching, and research.  As a part of Dr. Lasky's service duties, he was appointed Director of the Division of Transfusion Medicine of The Ohio State University (OSU) Hospitals.  Dr. Lasky was "expected to supervise all aspects of the service including quality assurance, accreditation, patient services, and relationships with the Red Cross." (Plaintiff's Exhibit 2.)  In addition, Dr. Lasky was required to obtain both an appointment to the attending staff of the University Hospitals and an Ohio medical license.  (Plaintiff's Exhibit 2.)

{¶5}   OSU was required to pay Dr. Lasky a base salary of $60,000 per year beginning November 1, 1993.   Pursuant to the agreement with OSU, Dr. Lasky executed a separate contract with University Pathology Services, Inc. (UPS) that required him to assign his professional fees to the corporation and become both a shareholder and an employee of the corporation.  Plaintiff's offer of employment with OSU also contained a copy of the departmental Patterns of Administration.

{¶6}   On July 7, 1999, Dr. Daniel Sedmak, Chair of the Pathology Department, and Dr. Lasky entered into a revised OSU employment agreement.   The agreement authored by Dr. Sedmak provides the following:

{¶7}   "You will step down from clinical service and focus on your research. Your new salary will be 60% of your total current salary with the understanding that you will seek funding from current and future sources for 100% coverage of the new salary level.  The fringe benefits will be proportionally adjusted.

**{¶8}** "You will serve as a consultant for Transfusion Medicine and will not be expected to have regular clinical service responsibilities. You may occasionally be available to cover absences of faculty in Transfusion Medicine, at an hourly rate, to be paid in addition to 60% salary, at $75/hour for time spent on-service and for time spent when called in on call, the latter at the appropriate percentage of this rate as determined by the rate currently charged in our logging records for call time when not called in. You will determine your availability for clinical work on this basis, should you be asked to perform it.

**{¶9}** "You may hold the title of Director of Academic Transfusion until a new permanent Director of Transfusion Medicine is named. A search for a new permanent Director of Transfusion Medicine will occur after a new Director of Clinical Pathology is appointed (planned to occur within 12 to 24 months). You are welcome to apply for this position.

**{¶10}** "At a fixed time before the end of this one year clinical leave (approximately 3 months), you will let the department know if you wish to continue with this part time arrangement, or to return to your previous duties. Those duties, along with benefits, will be as written in the 1993 offer letter with the following exceptions: 1) your salary will be based on your current full time salary, with appropriate cost of living and other increases, 2) you will negotiate your clinical responsibilities with the Chair and the director of clinical pathology, with the final decision to be made by the Chair.

**{¶11}** "You will focus on your stem cell and cord blood research, having time to write both manuscripts and new grant proposals. You will have a one-time grant from the department for $20,000 for your research." (Plaintiff's Exhibit 1.)

**{¶12}** Plaintiff argues that on October 1, 2005, OSU unilaterally reduced his salary in breach of his employment agreement and that he never entered into a contract where his salary would fluctuate based upon the amounts of his research grants.

Defendants argue that the reduction in salary complies with the parties' 1999 agreement.

{¶13} In order to recover for breach of contract, plaintiff must prove the existence of a contract, performance by the plaintiff, breach by the defendant, and damages or loss as a result of the breach. *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 2003-Ohio-5340; *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600.

{¶14} It is not disputed that the parties entered into a contractual relationship; however, the parties dispute Dr. Lasky's appropriate compensation under the agreement.

{¶15} A court is not required to go beyond the plain language of an agreement to determine the parties' rights and obligations if a contract is clear and unambiguous. *Cuthbert v. Trucklease Corp.*, Franklin App. No. 03AP-662, 2004-Ohio-4417, ¶21. If no ambiguity appears on the face of the instrument, parol evidence cannot be considered in an effort to demonstrate such an ambiguity. *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St.3d 635, 1992-Ohio-28.

{¶16} The construction of a written contract is a matter of law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, paragraph one of the syllabus. "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." Id. at paragraph two of the syllabus. The cardinal purpose of judicial examination of any written instrument is to ascertain and give effect to the intent of the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51. "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, paragraph one of the syllabus. The parties do not dispute that the 1999 agreement is unambiguous. Instead, the parties

disagree whether the 1999 agreement was subsequently modified by agreement of the parties.

{¶17} Dr. Lasky testified that the purpose of the 1999 agreement was to allow him more time to focus on his cord blood research while stepping away from clinical service. Dr. Lasky explained that he approached Dr. Sedmak about focusing on his research and obtaining external grants to cover the costs of research. Dr. Lasky stated that he (Dr. Lasky) suggested a 40% reduction in his base salary and offered to work towards obtaining funding. Dr. Lasky testified that he planned on extending his laboratory base and transitioning some of his research into clinical work by establishing a blood bank.

{¶18} Dr. Lasky testified that in August 1999, one month after signing the 1999 agreement, he spoke with Dr. Sedmak and Harry Pukay-Martin, Chief Administrative Officer and Financial Manager of the Department of Pathology, several times about receiving extra compensation for his research. Dr. Lasky stated that the cord blood project was expanding and that he needed to be compensated for his work. He explained that the blood banking program was beginning to encompass clinical service, although he admitted that he primarily dealt with hospitals other than OSU.

{¶19} Dr. Lasky testified that he returned to clinical work immediately after the 1999 agreement; however, he admitted that the only clinical work that he subsequently performed involved his cord blood research, which he had been performing prior to the 1999 agreement. Dr. Lasky explained that what he called clinical work involved the cord blood bank, which is a part of transfusion medicine. He explained that he established the operation, the procedures to be used regarding how to screen and test donors, and that he also reviewed the results and determined whether the cord blood was acceptable for transfusion.

{¶20} Dr. Lasky testified that the Red Cross had a business relationship with OSU and that OSU billed the Red Cross for his salary and benefits. Dr. Lasky

explained that StemCyte replaced the Red Cross in the operation for a time but that StemCyte no longer funds the blood bank.

{¶21} Dr. Sedmak testified that Dr. Lasky did not return to him, within one year of the 1999 agreement, and request to return to his prior duties. Dr. Sedmak explained that he had received numerous complaints from individuals in the blood bank and other faculty members regarding Dr. Lasky's contentious behavior and inability to administer in a collegial fashion and that, as a result, he paid close attention to Dr. Lasky and his duties. Pukay-Martin denied having any conversation with Dr. Lasky regarding returning to his previous duties.

{¶22} Dr. Lasky's salary report states that in 1999, a new letter of agreement adjusted his salary to 60% of its then current value. (Plaintiff's Exhibit 7.) In 2000, "ARC contract funding" allowed his salary to be adjusted to 80% of its value prior to the 1999 agreement. Id. In 2001, Dr. Lasky's salary was adjusted to 100% with "80% ARC and 20% Lasky research funds." Id. The guarantee listed in Dr. Lasky's salary report remained the same in each of these periods with the exception of several .5% raises. On October 1, 2002, Dr. Lasky's salary was "increased to 1.0 FTE with new grants." In 2005, Dr. Lasky's salary was "reduced to .6 FTE; no grants supporting salary." Id.

{¶23} Regarding the 1999 agreement, Dr. Sedmak testified that Dr. Lasky was to be paid 60% of his then total current salary, which served as a base salary. Dr. Sedmak explained that Dr. Lasky was then encouraged to fund his salary with grants, but that he would not be paid less than 60% of his total current salary. Dr. Sedmak explained that if Dr. Lasky was able to cover more than 60% of his salary with grants, then the additional grants would allow him to earn more than 60% of his salary. Dr. Lasky denies that he entered into an agreement whereby his salary could fluctuate based upon the amount of grant funding he had received.

{¶24} Pukay-Martin explained that there were times when Dr. Lasky was able to obtain funding to support his base of 60% plus an additional amount but that Dr. Lasky had not been able to support his salary above 60% at any point beyond 2005.

{¶25} Dr. Sedmak explained that prior to 1999, Dr. Lasky was an active clinical pathologist involved with patient diagnosis and care but that he has not participated in clinical practice since that time. Dr. Sedmak testified that cord blood banking is investigational rather than clinical inasmuch as blood banking is a manufacturing process involving tissue procurement and banking; that at no point after the execution of the 1999 agreement did Dr. Lasky either return to clinical duties or regain his former title as Director of Academic Transfusion.

{¶26} Dr. Lasky testified that in 2005, OSU reduced his salary to 0.6 full-time equivalent (FTE) at the same time that his research funding was in an overdraft situation. Dr. Lasky explained that his research grant had ended; however, OSU continued to draw his salary from the grant-supported funding account causing an overdraft. Dr. Lasky explained that OSU used money from his faculty rotary account and sold a piece of his research equipment to cover the overdraft.[1]

{¶27} Dr. Barsky testified in his deposition that he became chair of the pathology department in 2005 and became acquainted with Dr. Lasky within the first few months.[2] Dr. Barsky explained that when he began as chair, Pukay-Martin informed him that Dr. Lasky's research grants were in serious overdraft. Pukay-Martin testified that the grants are supported by an outside source, and a deficit occurs when the researcher spends more money than the grant has paid. Dr. Barsky explained that at the University of California at Los Angeles, where he had previously worked, the research foundation both administered the grants and monitored research spending so that overdrafts would

---

[1] Dr. Sanford Barsky, Chair of the Department of Pathology, stated that a rotary fund is an account given to all faculty members as a start-up discretionary fund that they can use for their professional development.

not occur. Dr. Barsky testified that at OSU the department controls the flow of research money. Dr. Barsky explained that the principal investigator is in charge of being financially responsible and that the situation caused him to review Dr. Lasky's salary, overdraft, and employment agreements.

{¶28} On September 16, 2005, Dr. Barsky sent Dr. Lasky a letter regarding the overdraft situation. Dr. Barsky outlined a plan to reduce the $123,884.75 overdraft and informed Dr. Lasky that "[t]his financial re-allocation will allow you to continue your operation without your salary being affected for the next 2 months." Dr. Barsky also advised him that his salary would be reduced to 60%. (Plaintiff's Exhibit 12.) Pukay-Martin explained that once Dr. Lasky satisfied the deficit, there were no ongoing funds available in his research account and that his salary was subsequently reduced to 60% pursuant to the 1999 agreement. Dr. Barsky testified that he then met with Dr. Lasky on September 22, 2005, to discuss the reduction in salary. Dr. Barsky then sent a follow-up letter on September 27, 2005, memorializing the reduction. "The Office of Human Resources has approved the 2005-2006 salary adjustments. Your annual salary effective October 1, 2005, is $102,153.60 at 0.6 FTE." (Plaintiff's Exhibit 3.)

{¶29} Dr. Barsky explained that in making the salary determination he had reviewed both the 1993 and 1999 employment agreements. Dr. Barsky stated that the 1999 agreement set Dr. Lasky's salary at 0.6 FTE. Dr. Barsky explained that 0.6 FTE was how OSU expresses salaries rather than full-time or part-time status. Dr. Barsky stated that he also looked at Dr. Lasky's duties and responsibilities. Dr. Barsky testified that Dr. Lasky was a researcher and an associate professor but that he had no clinical service duties, which meant that he did not derive clinical income. Dr. Barsky testified that based on the 1999 agreement, Dr. Lasky's salary should be 60 percent of his total

---

[2] Dr. Barsky's deposition was admitted as Plaintiff's Exhibit 25.

current salary.  Dr. Barsky further asserted that Dr. Lasky did not have the grant support to sustain his salary.

{¶30} Based upon the testimony of Dr. Sedmak and Pukay-Martin, the court concludes that Dr. Lasky was entitled to receive "60% of [his] total current salary" under the 1999 agreement.  Additionally, the 1999 agreement required Dr. Lasky to "step down" from his clinical duties and to focus on his cord blood research.  Dr. Lasky has failed to persuade the court that he "return[ed] to his previous duties" and that his research became clinical shortly after signing the 1999 agreement.  The court is persuaded by the testimony of Pukay-Martin that Dr. Lasky was to receive pay above 60% only when his research funding exceeded his base salary.  The court is also convinced that the parties did not subsequently modify the 1999 agreement.

## PATTERNS OF ADMINISTRATION

{¶31} Dr. Lasky testified that defendants have not provided him with his appropriate benefits pursuant to the pathology department's Patterns of Administration (POA).  Dr. Sedmak explained that the POA are rules of administration developed by the department chair and approved by the faculty. According to the POA, faculty members could receive two bonuses based upon research: "Research Grants" and "Coverage of Faculty Salary" (CFS).

{¶32}  The POA in effect from January 7, 2002 through June 6, 2007, under the heading CFS states:  "At the end of the fiscal year, a faculty member who obtained from research grants 10% or more of his/her total salary* will be given a bonus * * * The faculty member may choose to have the equivalent funds placed in his/her research rotary rather than taking a salary bonus. * Total salary includes income from all sources, which may be all from COM&PH or the combination of both COM&PH and UPS.  Grant supported salary is distributed according to the release time policy of the department."

(Plaintiff's Exhibit 6.) Additionally, the bonus policy was "contingent upon sufficient available funds in the department." The POA was revised effective June 6, 2007, eliminating the CFS bonus program.

{¶33} Dr. Lasky asserted that he was paid the CFS bonus in 2001, but that he has not received any since that time even though he contacted Pukay-Martin to request the bonus. Plaintiff, however, provided no evidence demonstrating that OSU had "sufficient available funds" to provide him with a bonus. Moreover, as noted above, Pukay-Martin testified that Dr. Lasky has not been able to support his salary above 60% at any point beyond 2005 and that in 2005, his research funding was in a serious overdraft situation. Dr. Lasky's OSU salary report indicates that he had "no grants supporting his salary" in 2005 and that his salary did not change in 2006. (Plaintiff's Exhibit 7.) In short, plaintiff failed to persuade the court that he had been denied his appropriate CFS bonus.

{¶34} For the foregoing reasons, the court concludes that plaintiff has failed to prove his claim by the preponderance of the evidence. Judgment shall be entered for defendants.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

LARRY C. LASKY, M.D.

     Plaintiff

     v.

THE OHIO STATE UNIVERSITY, et al.

     Defendants
     Case No. 2007-07647

Judge Alan C. Travis

## JUDGMENT ENTRY

{¶35} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendants. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
ALAN C. TRAVIS
Judge

Case No. 2007-07647 - 12 - ENTRY

cc:

Edward R. Forman
John S. Marshall
Steven D. Dransfield
111 West Rich Street, Suite 430
Columbus, Ohio 43215-5296

Emily M. Simmons
Randall W. Knutti
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Louis A. Jacobs
66871 Rayo Del Sol
Desert Hot Springs, California 92240-1871

GWP/dms
Filed August 1, 2011
To S.C. reporter September 22, 2011